**Ina M. OVERTON, Appellee,**

v.

**UNITED STATES of America, Appellant.**

**No. 79–1847.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 17, 1980.

Decided April 21, 1980.

Jeffrey Axelrad, Civ. Div., Torts Branch, Dept. of Justice, Washington, D. C., for appellant; Alice Daniel, Acting Asst. Atty. Gen., Eloise E. Davies, Marleigh Dover Lang, Mary L. McElroy, W. Russell Welsh, Washington, D. C., and Ronald S. Reed, U. S. Atty., Kansas City, Mo., on brief.

Lyman Field, Field, Gentry, Benjamin & Robertson, Kansas City, Mo., for appellee.

Before LAY, Chief Judge,* STEPHEN-SON, Circuit Judge, and THOMAS,** Senior District Judge.

STEPHENSON, Circuit Judge.

The appellee, Ina M. Overton, sued the United States for injuries resulting from a swine flu vaccination.[1] The government conceded liability but disputed the amount of damages. After a non-jury trial, the district court[2] awarded plaintiff $106,500 in general damages and $7,139.23 in special damages. The government appeals on two grounds: (1) the court clearly erred in setting the amount of the award; (2) the court should have reduced the award to take account of plaintiff's Medicare benefits. We affirm the district court's assessment of damages but reverse its decision not to deduct the money plaintiff received under Medicare.

I. Factual Background.

The district court recounted the evidence as follows:

The plaintiff's evidence clearly established that at the time she received her Swine Flu shot (October 26, 1976) she was a resident of the John Knox Retirement Village, which is located near Kansas City Missouri. She was 77 years of age and very active, both physically and mentally. She had lived a very active life and continued her activities by participating in the numerous social activities at the village, and, in fact, was chairman of several committees which planned and arranged these activities.

Approximately 20 days after receiving the flu shot, she started suffering the symptoms of the disease [Guillain-Barre Syndrome, a form of infectious neuronitis]. Her first symptoms were partial paralysis of her hands and feet and the disease progressed by the paralysis extending upward in both her arms and legs. She was first placed in the medical center of the John Knox Village and on November 22 admitted to St. Luke's Hospital in Kansas City, Missouri. Her condition was very critical for about one month and then recovery and improvement commenced about Christmas Day. She required extensive nursing care, flotation pad, heel pads, bunny boots for her foot drop bilaterally, catheter care and rectal and colon care. She developed considerable perianal pruritis and pain, had numerous impactions and became depressed because of the severity of her illness. She was dismissed from the hospital on January 14, 1977 and returned to the medical center at John Knox Village. At that time she was able to stand with assistance and walk a few steps with two persons helping her. After a lengthy convalescence at the medical center, she

* The Honorable Donald P. Lay became Chief Judge of the Eighth Circuit on January 1, 1980.

** The Honorable Daniel H. Thomas, Senior United States District Judge for the Southern District of Alabama, sitting by designation.

1. This was the first case tried under the National Swine Flu Immunization Program of 1976, 42 U.S.C. § 247b(j)(1). The program provides that the United States shall be liable in tort or for breach of warranty for injuries arising out of

administration of the swine flu vaccine, *id.* at § 247b(k)(2)(A). The program further provides, *id.* at § 247b(k)(5)(A), that swine flu actions are deemed to be actions brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80.

2. The Honorable William R. Collinson, United States District Judge for the Western District of Missouri.

was able to return to her room at the John Knox Village, but the evidence showed that she continued until the date of trial to suffer severe disabilities as a direct result of her illness. She is now able to walk short distances with the aid of a crabfoot cane, but is very unsteady due to weakness in her legs and supports herself by pressing against a wall whenever possible. She is unable to attend or participate in the numerous social activities which she enjoyed previously, and spends a great deal of her time in her bed in her room. Prior to her illness, she had had a slight tremor in her hands, but since her hospitalization, there has been substantial aggravation of this, particularly in her right hand, which has severely impaired her ability to write or even feed herself. Her doctor (who had treated her for a number of years) testified that these disabilities were directly and proximately caused by the illness. He further testified, and all the evidence established, that she has, as a result of her illness, a markedly reduced physical ability and endurance and a greatly impaired energy and strength potential. Undoubtedly, her ability to enjoy the type of activity in which she engaged before her illness has been terminated and she is unable to participate to any degree in the outside activities which she enjoyed before her illness. The defendant's [neurosurgeon] who examined the plaintiff added the fact that because of her impaired balance and the weakening of her legs she has a continual risk of falling, which at her age could result in fractured bones, which could be not only disabling but life threatening.

The Court could continue with a much more detailed account of the change in plaintiff's life style, but, to summarize the evidence in this case, the Court finds that Mrs. Overton had lived a very active life and had a great capacity for making friends and enjoying her associations with other people. She is undoubtedly a woman who, in old-fashioned terms, has a great deal of spunk and grit. Her ability to enjoy even the simplest pleasures is greatly impaired. For example, she can only enjoy the company of her friends when they drop by her room for a visit. Her present disabilities are unquestionably permanent. To evaluate what she has lost in monetary terms is most difficult.

It was on this basis that the court awarded general damages of $106,500.

## II. Whether Damage Award Was Clearly Erroneous.

The government's first point on appeal is that the court's award is "clearly erroneous" under Fed.R.Civ.P. 52(a). The government contends that the court did not acknowledge the extent to which maladies unrelated to plaintiff's Guillain-Barre Syndrome (GBS) contributed to plaintiff's condition and that the amount of the damage award was, in any event, excessive.

As examples of maladies ignored or misinterpreted by the court, the government cites the plaintiff's thyroid problems, her markedly diminished hearing, her partial blindness, the fracture of her shoulder in 1975, the arthritis in her knees, and the nervous tremor in her hands. With the exception of the tremor (which grew worse, the court indicated, as a result of the swine flu shot), the court did not mention these maladies in assessing plaintiff's loss.

▆▆▆ Our own review of the record convinces us that the amount of the award was based on no error of law or clearly erroneous finding of fact. The court properly compared the plaintiff's condition immediately before her illness with her condition thereafter and made sufficiently detailed subsidiary findings to support his ultimate conclusions. The evidence is uncontroverted that, prior to her swine flu injection, plaintiff enjoyed an active life style, her maladies notwithstanding.[3] During and af-

---

3. The court considered trial testimony as well as documentary evidence of plaintiff's medical history. The court heard the testimony of plaintiff, plaintiff's personal physician (an internist), and four residents of the John Knox Retirement Village who had observed plaintiff

ter her illness, which subjected her to debilitation and paralysis, plaintiff has led a life of confinement. The court was entitled to find that plaintiff's mental anguish and loss of health and mobility stemmed from her bout with GBS and not from her other maladies. Indeed, the existence of plaintiff's maladies, far from diminishing the government's responsibility for her present condition, increased it to the extent that these maladies were aggravated by GBS[4] and to the extent that these maladies now make a greater contribution toward her disability. Cf. Heppner v. Atchison, Topeka & Santa Fe Railway, 297 S.W.2d 497 (Mo. 1956) (in action brought under Federal Employer's Liability Act, railroad was liable for death of employee where railroad's negligence caused him to strike his head against a window and thereby activate a dormant cancer which resulted in his death). We conclude there was substantial evidence for the court to find that plaintiff's present problems—her disabilities and her heightened risk of injury through falling—were directly and proximately caused by the illness, for which the government has conceded responsibility.

■ The government also contends that, however we view the evidence of causation, the amount of the damage award is excessive. Although the amount of damages entered in a non-jury case is a finding of fact and therefore subject to the "clearly erroneous" standard of review set forth in Fed.R. Civ.P. 52(a), any application of that general standard must take account of the special circumstances in which that kind of factual finding is rendered. We have long subscribed to the view that

> excessiveness of a verdict is basically, and should be, a matter for the trial court which has had the benefit of hearing the testimony and of observing the demeanor of the witnesses and which knows the community and its standards; that this is a responsibility which, for better working of the judicial process and for other seemingly obvious reasons, is best placed upon its shoulders; and that we shall continue to consider review, as we have said before, not routinely and in every case, but only in those rare situations where we are pressed to conclude that there is "plain injustice" or a "monstrous" or "shocking" result.

Solomon Dehydrating Co. v. Guyton, 294 F.2d 439, 447–48 (8th Cir.), cert. denied, 368 U.S. 929, 82 S.Ct. 366, 7 L.Ed.2d 192 (1961). Accord, Hysell v. Iowa Public Service Co., 534 F.2d 775 (8th Cir. 1976) (Solomon standard applies in a non-jury as well as a jury case).

■ The district court arrived at its figure of $106,500 in general damages by awarding plaintiff $1,000 a month for the thirty months from her illness and hospital-

---

both before and after her swine flu injection. The court also heard the testimony of the government's witness, a neurosurgeon who treated plaintiff during her illness and who examined her once thereafter, in preparation for trial.

All of the maladies cited by the government as contributing to plaintiff's present disabilities existed prior to plaintiff's illness, with the exception of her partial loss of hearing. The government produced no evidence that plaintiff's hearing problem contributed to the cloistered life style that has been her lot since her bout with GBS. Plaintiff testified at trial without apparent difficulty.

4. Some of the lay witnesses and plaintiff's physician noted that plaintiff's hand tremor grew worse after plaintiff's illness. Plaintiff testified that physicians at Kansas University Medical Clinic had attributed her tremor to tension. She further testified that her illness and its effects increased her nervousness and made her tremor worse. Plaintiff's attending physician testified that the aggravation of the tremor stemmed directly from plaintiff's GBS.

The government's physician witness, however, testified that he could not say the tremor was due to the nervousness, and that he doubted that anyone else could. He further testified that he believed it would be impossible for GBS to aggravate the tremor and that plaintiff's GBS-related physical impairment was confined to her legs.

The weight to be accorded the differing testimony, expert and nonexpert, was within the trial court's discretion. See, e. g., Pittman v. Gilmore, 556 F.2d 1259, 1261 (5th Cir. 1977). Upon our examination of the record, we conclude the court did not abuse its discretion in crediting the testimony that the aggravation of plaintiff's tremor was attributable to GBS.

ization to the date of trial and $750 a month for the 8.6 years of her life expectancy at the date of trial. Although the award appears generous, we are not, after reviewing the record, pressed to conclude the award is monstrous, shocking, or plainly unjust. We accordingly decline to interfere with the trial court's assessment of plaintiff's loss.

### III. Whether Collateral Source Rule Should Apply.

The government's second point on appeal is that the district court erred in awarding $7,139.23 in special damages to cover plaintiff's stipulated medical expenses without deducting the $5,582.88 already paid on plaintiff's behalf through Medicare. Absent this deduction, contends the government, plaintiff will have a double recovery of some of her medical expenses or, perhaps more accurately, a recovery for a non-existent loss. Plaintiff responds that any deduction would have been unwarranted because the Medicare program was a "collateral source" under Missouri law.[5] The government rejoins that the source of plaintiff's damages payment and the source of her Medicare payment were in fact not collateral but the same: the revenue of the United States treasury.

Medicare, a federal program designed to ensure that the aged receive adequate medical care, was enacted as a Social Security Act amendment in 1965, see 42 U.S.C. §§ 1395–1395ll. Plaintiff received her benefits under Part A of Medicare, 42 U.S.C. §§ 1395c to 1395i–2, out of the "Federal Hospital Insurance Trust Fund." This fund consists primarily of "amounts appropriated * * * from the general fund in the Treasury to the Trust Fund, such amounts

to be determined on the basis of estimates * * * of the [social security] taxes [levied for hospital insurance and] * * * paid to or deposited into the Treasury." 42 U.S.C. § 1395i. Insofar as the record reveals, neither plaintiff nor her husband paid any of the taxes that determine the level of appropriations for the Part A trust fund; both were over age 65 when Medicare was passed.[6]

Because the present case is deemed to have been brought under the Federal Tort Claims Act (FTCA), see note 1 supra, the issue presented here is whether the district court erred in concluding that the Medicare benefits of a noncontributing recipient should be considered collateral to his FTCA damage award. Although no case has addressed this narrow question, several cases have considered whether plaintiffs receiving other forms of governmental benefits can claim them as collateral payments in an FTCA action.[7] The district court followed the most recent of these cases, Smith v. United States, 587 F.2d 1013 (3d Cir. 1978), which held that "where state law recognizes the 'collateral source' doctrine, Social Security benefits should not be deducted from a recovery under the Federal Tort Claims Act." Id. at 1016.

This broad holding in Smith would justify the district court's decision not to deduct the money plaintiff had already received through Medicare. In our view, however, the philosophy underlying Missouri's collateral source rule does not warrant a holding so broad. Our analysis of the rule leads us to conclude that it is essential in a case like this that the plaintiff show he has contributed to the fund he claims as a col-

---

**5.** The law of Missouri governs because the swine flu injection was administered there. See 28 U.S.C. § 1346(b) (in damage action against the United States for "wrongful act or omission," look to "law of the place where the act or omission complained of occurred"); 28 U.S.C. § 2674.

**6.** Plaintiff was apparently not entitled to receive benefits under Part A's eligibility provision, 42 U.S.C. § 1395c(1) (referring to 42 U.S.C. §§ 402, 414(a)), but rather was deemed entitled to benefits under regulation 42 C.F.R.

§ 405.103 (1978) (transitional entitlement of aged uninsured individuals to hospital insurance benefits) because she reached age 65 before 1968, id. § 405.103(a)(1)(i).

**7.** The cases are collected at 12 A.L.R.3d 1245, 1248–54 (1967 & Supp.1979) (application of collateral source rule in action under FTCA—government itself as collateral source) and in Smith v. United States, 587 F.2d 1013, 1015–16 (3d Cir. 1978).

lateral source. Plaintiff's failure to do so here is fatal to her case.

 The collateral source rule is an exception to the general rule that damages in tort should be compensatory only. The rule permits recovery against a wrongdoer for the full amount of damages even though the plaintiff is also compensated from a different source (such as an insurance company) which is "wholly independent" of the wrongdoer and whose payment is therefore collateral to his. *Iseminger v. Holden*, 544 S.W.2d 550, 552 (Mo.1976).

 Missouri courts have articulated two rationales for the collateral source rule. One is that the wrongdoer does not deserve to benefit from the fortuity that the plaintiff has received or will receive compensation from a source wholly independent of the wrongdoer.

> The philosophy underlying the Collateral Source Rule seems to be that either the injured party or the tort feasor is going to receive a windfall, if a part of the pecuniary loss is paid for by an outside source and that it is more just that the windfall should inure to the benefit of the injured party than that it should accrue to the tort feasor. This conclusion seems to be based on substantial justice. This reasoning, however, does not apply in a situation where the collateral source is the defendant himself. Under those circumstances no one gets a windfall and if a recovery were allowed * * * the

result would be that the plaintiff would receive a double recovery and that the defendant would be mulcted twice for the same item of damages.

*Hamilton v. Slover*, 440 S.W.2d 947, 958 (Mo.1969) (quoting *Adams v. Turner*, 238 F.Supp. 643, 644–45 (D.D.C.1965)).

A further rationale stemming from this notion of "substantial justice" is that the plaintiff deserves any additional compensation he may receive because he has "contracted" for it, because it is in the nature of insurance. "[O]ne can justify a double recovery where the original source was supplied by the plaintiff, himself, out of resources that would otherwise have been available to him for other purposes * * ." *Smith v. United States, supra*, 587 F.2d at 1015 (quoting *Feeley v. United States*, 337 F.2d 924, 928 (3d Cir. 1964)).[8]

 Both rationales are evident in *Kickham v. Carter*, 335 S.W.2d 83 (Mo.1960):

> It is our view that plaintiff was entitled to recover reasonable hospital expenses incurred as a result of injuries resulting from the negligence of defendant even though such expenses were actually paid by the Blue Cross organization in response to its contract with plaintiff * * . Upon principle there would appear to be no logical reason for defendant to receive the benefit of hospitalization payments (in the nature of insurance) made by an organization such as Blue Cross to which plaintiff had no doubt made contributions

---

**8.** Although application of the collateral source rule will not lead to double recovery in the typical case of property damage, where the insurer is subrogated as a matter of law to the insured's rights against the liable party, *see* 3 J. Appleman, Insurance Law & Practice § 1675 (1967), the rule often will operate to give plaintiff a windfall in the typical personal injury case, because subrogation as a matter of law is not the rule, *see id.*, and because subrogation as a matter of contract is uncommon, *see* Fleming, *The Collateral Source Rule and Loss Allocation in Tort Law*, 54 Cal.L.Rev. 1478, 1502–03 (1966).

Application of the collateral source rule is also likely to give plaintiff a windfall where, as

here, the collateral payment consists of governmental benefits rather than private insurance. Although "[m]ost of the world's social security schemes maintain a common front against beneficiaries enriching themselves from cumulative recoveries," Fleming, *supra*, 54 Cal.L.Rev. at 1514, the United States, with some exceptions such as set-off provisions in workmen's compensation statutes and the Federal Employer's Liability Act, *see* Note, *Unreason in the Law of Damages: The Collateral Source Rule*, 77 Harv.L.Rev. 741, 742, 752–53 (1964), does not. Fleming, *supra*, 54 Cal.L.Rev. at 1515–16.

The present case is an instance in which there appears to be no safeguard against recovery of a nonexistent loss.

in accordance with a membership agreement.

*Id.* at 90.[9]

■ A plaintiff may invoke the collateral source rule, then, either when the payment in question came from a source wholly independent of the liable party or when the plaintiff may be said to have contracted for the prospect of a "double recovery." For example, if plaintiff is compensated for his loss by a magnanimous friend, wholly independent of the liable party, the first rationale applies: the liable party is not entitled to any set-off even though the plaintiff can not be said to have contracted for a windfall. To take another example, if plaintiff happens to be wronged by the same insurance company that has insured against plaintiff's loss, the second rationale applies: the plaintiff is entitled to a "double recovery" even though the liable party (the insurance company) and the collateral source (the policy issued by the company) cannot be said to be wholly separate.

The Missouri Supreme Court found neither rationale implicated in *Hamilton v. Slover, supra,* 440 S.W.2d at 957–58, a case analogous to the one presented here. In *Hamilton,* a passenger in an automobile sued the driver for injuries occasioned by the driver's negligence. The court held it was proper to deduct from the damage award the $500 in medical payments that plaintiff had already received from the driver's insurance company.[10] The insurance company was not a collateral source because it was not wholly independent of the liable party, who had created the $500 fund by his purchase of insurance and payment of premiums. Nor was this a case where plaintiff attempted to justify a double recovery by claiming that he had contributed toward the fund in question.

■ In the present case, as in *Hamilton,* neither rationale of the collateral source rule is present.[11] The original payment (from Medicare's Part A trust fund) is not wholly independent of the liable party's payment (from general revenues of the federal treasury); and there is no warrant to believe the plaintiff has contributed toward the source of the original payment. Although the proximate source of plaintiff's benefits, the Federal Hospital Insurance Trust Fund, is a bookkeeping entity conceptually collateral to the unfunded general revenues out of which FTCA damage awards are made, the trust fund consists of appropriations from those general revenues, 42 U.S.C. § 1395i, and is in any case the creation of the government's taxing and spending power; it is not wholly independent of the government itself. *Cf. Hamilton v. Slover, supra,* 440 S.W.2d at 958 (source is not collateral if it is directly attributable to defendant).[12] At the same

9. *Kickham v. Carter,* 335 S.W.2d 83 (Mo.1960), involved a question of evidence, not damages. The collateral source doctrine governs admissibility of evidence as well as computation of damages. That distinction does not affect the pertinence of *Kickham* here.

10. The plaintiff received the $500 under the "medical payments clause" of defendant's insurance contract, which apparently provided that a passenger in defendant's automobile was entitled to recover medical expenses regardless of whether defendant was at fault. *See generally* West, *The Collateral Source Rule Sans Subrogation: A Plaintiff's Windfall,* 16 Okla.L. Rev. 395, 410 (1963).

11. We have discussed only the two rationales Missouri courts have expressly endorsed. Other rationales, offered elsewhere and in different situations, do not seem pertinent here. *See, e. g.,* Note, *Unreason in the Law of Damages: The Collateral Source Rule,* 77 Harv.L.Rev. 741, 748–52 (1964) (future benefits from collateral source are too hard to compute; nondeduction of collateral benefits results in undercompensation; where collateral payment was a gift the court should honor donor's intent to benefit plaintiff, not tortfeasor; legislative scheme provides that collateral benefits shall not reduce plaintiff's damages).

12. *Hamilton v. Slover,* 440 S.W.2d 947 (Mo. 1969), also disposes of our decision in *Chicago G. W. Ry. v. Peeler,* 140 F.2d 865, 868 (8th Cir. 1944). In *Peeler,* an injured railroad employee secured compensation from his negligent employer under the Federal Employer's Liability Act (FELA) and also received railroad retirement pension benefits which apparently were accelerated by the employee's injury-related disabilities. The *Peeler* court held the employer could not set off from damages the amount of the pension benefits that was attributable to the employer's contributions into the pension

time, Medicare and other social security benefits generally "may be accurately described as a form of social insurance," *Flemming v. Nestor*, 363 U.S. 603, 609, 80 S.Ct. 1367, 1372, 4 L.Ed.2d 1435 (1960), and if an FTCA plaintiff can show his benefits would be in the nature of insurance as to him, the collateral source rule would justify a "double recovery" notwithstanding the connection between the social security fund in question and the government's general revenues. Here, however, plaintiff's Medicare benefits were not in the nature of insurance as to her because she made no contribution toward Part A of Medicare. No rationale of the collateral source rule is implicated and therefore the Medicare benefits should have been deducted from the FTCA damage award.

■ This result is consistent with the results of the other FTCA cases involving the collateral payment of governmental benefits. In *Smith v. United States, supra,* the principal case cited by the district court and by plaintiff on appeal, the Third Circuit held that a plaintiff's social security survivor's benefits were collateral to, and thus not deductible from, an FTCA damage award. The *Smith* court differentiated "unfunded general revenues of the United States [from which FTCA damage awards are made] and those [revenues] which come from 'a special fund supplied in part by the beneficiary or a relative upon whom the beneficiary is dependent.'" 587 F.2d at 1015–16 (quoting *United States v. Harue Hayashi*, 282 F.2d 599, 603 (9th Cir. 1960)). The distinction underlying both *Smith* and

*Hayashi*, the case on which the *Smith* court relied, can be stated as either (1) a distinction between a special fund (in that instance, the Federal Old-Age and Survivors' Insurance Trust Fund) and governmental funds generally, or (2) a distinction between those proceeds that are in the nature of insurance to the plaintiff and those proceeds that are not. In our view the first distinction is unsound, although some courts have purported to rely on it, because it makes recovery depend on bookkeeping conventions and because it ignores the substantial governmental involvement in the creation and administration of social security programs. It is an artificial distinction that invokes no notion of "substantial justice" to support a possible double recovery by plaintiff. It is the second distinction that best explains *Smith* and *Hayashi*. Absent some statute to the contrary, plaintiffs receiving governmental benefits should receive their FTCA awards free of any set-off for those benefits if there is a showing or a presumption that they or one on whom they were dependent paid a special levy or fee to make the benefits possible.[13] Absent a special payment by plaintiff, the government should not be forced to compensate plaintiff twice, once with money funneled through a special compensation scheme, and again with expenditures from general revenues.

■ Other FTCA cases involving payment of collateral governmental benefits are in substantial accord. Benefits received by an FTCA plaintiff under the Civil Service Retirement Act and National Service

---

fund. The employer had failed to plead as an affirmative defense the set-off to which it was entitled under FELA, and the court reasoned that "[w]ithout the aid of the statute an employer can not set up in mitigation of damages in a tort action by an injured employee indemnity from a collateral source, such as insurance or [workmen's compensation] even where the defendant has contributed to the fund." *Id.* Although plaintiff would urge we extend *Peeler* to this case, we must follow *Hamilton* since it states the applicable Missouri law. And *Hamilton* allows the defendant to set off the amounts that plaintiff has received from sources to

which defendant has contributed and plaintiff has not.

13. In *United States v. Harue Hayashi*, 282 F.2d 599, 604 (9th Cir. 1960), the court referred to the contribution paid by plaintiff's decedent; in *Smith*, the court appears to have presumed such a contribution, see 587 F.2d at 1015–16 (quoting language from *Hayashi*). Here, there is neither a showing nor a basis for presumption because plaintiff did not demonstrate any contribution and because she received her Medicare benefits under a transitional entitlement provision that requires no contribution, see note 6 *supra*.

Life Insurance are collateral,[14] benefits in the form of free hospital care and veterans' disability benefits are not.[15] Thus, where the FTCA plaintiff's governmental benefits are attributable to a special levy or premium that the plaintiff has paid, he is entitled to receive his benefits in addition to his full FTCA damages. But where the governmental benefits are not so attributable, FTCA damages must be set off accordingly. There may be cases in which the government is entitled to a partial set-off, to the extent that governmental benefits primarily attributable to special levies or premiums are in fact attributable to general taxation,[16] but the government is relieved of any duty to make such a showing here inasmuch as plaintiff has not shown she had made any contribution or shown why in this case a contribution should be presumed.

Because we decide plaintiff may not recover for the medical expenses already paid on her behalf through Medicare, we need not address the government's argument that, regardless of whether the collateral source rule applies, money received from Medicare must be deducted from the FTCA damage award in order to comply with the mandate of 28 U.S.C. § 2674 that the United States "shall not be liable for * * * punitive damages." [17]

We conclude that the $5,582.88 plaintiff received in Medicare benefits must be deducted from plaintiff's total award of $113,639.23, which we otherwise affirm as not clearly erroneous.

LAY, Chief Judge, concurring and dissenting.

I respectfully dissent from that portion of the majority opinion which finds that plaintiff's Medicare benefits should have been deducted from her damage award. I would affirm the district court's judgment.

When an outside source pays part of a compensable loss, the question is whether the injured party or the tortfeasor should receive the windfall. *Hamilton v. Slover*, 440 S.W.2d 947, 958 (Mo.1969). The answer under Missouri law is based on substantial justice. *Id.* The more equitable practice, when the source is collateral to the defendant, is to allow the victim double recovery rather than benefit the wrongdoer. In tacitly approving *Smith v. United States*, 587

---

14. *E. g., United States v. Price*, 288 F.2d 448, 450–51 (4th Cir. 1961) (retirement benefits of civil service employees are collateral; they are "derived in large measure from the contributions of the employees"); *United States v. Brooks*, 176 F.2d 482, 485 (4th Cir. 1949) (proceeds paid by United States as insurer are collateral; "[t]his was insurance bought and paid for by deceased; and the government was no more entitled to deduct the amount which it paid as insurer from its liability for wrongful death than if the insurance had been paid by a private insurer").

15. *E. g., Steckler v. United States*, 549 F.2d 1372, 1379 (10th Cir. 1977) (veteran's benefit was "unquestionably a non-collateral source which is deductible from an award in that it is derived entirely from government funds and cannot be claimed to originate in any collateral contribution"); *Feeley v. United States*, 337 F.2d 924, 933–34 (3d Cir. 1964) (veteran may not recover value of medical care he received from United States free of charge; *United States v. Gray*, 199 F.2d 239, 243–44 (10th Cir. 1952), appears *contra* but actually is not).

16. Because plaintiff cannot invoke the collateral source rule, we need not consider the propriety of the suggestion in *Steckler v. United*

States, 549 F.2d 1372 (10th Cir. 1977), that social security disability benefits, although a collateral source "insofar as they represent payments made by the injured person and his employer," should be deductible by the government in an FTCA action to the extent "the government has supplemented the fund," *id.* at 1379. *But cf. United States v. Price, supra*, 288 F.2d at 450–51 (disallowing any deduction from plaintiff's FTCA damage award even though half of plaintiff's collateral payment was attributable to governmental supplement rather than plaintiff's own contribution). The logic of *Steckler* is consistent with our rationale here, although it would seem that the burden of demonstrating the proportion of plaintiff's collateral benefit that is due to general taxation instead of special levy or fee should be upon the government, not the plaintiff, since the government has the benefit of the set-off and is presumably in the best position to marshal the relevant data. *Accord, Smith v. United States, supra*, 587 F.2d at 1016; *contra, Steckler, supra*, 549 F.2d at 1379.

17. The Third Circuit reached and rejected the government's argument in *Smith v. United States, supra*, 587 F.2d at 1016–17.

F.2d·1013 (3rd Cir. 1978), we have endorsed the rule of substantial justice when a government social insurance benefit program is the source, *even though* it is not a collateral source in a federal tort claim case. We have decided, incorrectly I believe, not to follow this rule where a recipient receives insurance benefits, but has not contributed to the program through social security taxes.

The rationale adopted by the majority is that Medicare payments create a situation analogous to that in cases involving private insurance coverage.[1] When a private insurance company makes a payment pursuant to a contract with the plaintiff, a tortfeasor cannot deduct it from its damage payment. In the context of government benefits, this can never strictly be the case, because benefits are granted on the basis of statutory eligibility requirements, not by contract. Generally, if one is 65 and is entitled to monthly cash benefits under section 202 of the Social Security Act, (*i. e.*, the requisite quarters of coverage are present), one is automatically entitled to Medicare Part A hospital insurance benefits. 42 C.F.R. § 405.102(a)(1). An individual does not pay premiums for Part A hospital insurance, or pay social security taxes in any special manner or sum or in proportion to the extent of coverage received. No direct payment is made to the Federal Hospital Insurance Trust Fund. There is an element of contribution, however, because social security tax revenues determine the level of appropriations from the treasury to the trust fund in any given year. Nevertheless, a person's right to receive Medicare Part A is in the nature of statutory entitlement, not contract. Thus, in the area of governmental social benefit programs, the underlying rationale for the collateral source rule must be application of simple rules of equity. When the government in one role pays benefits to all citizens who meet statutory conditions, it is inequitable for it to set off such payments in mitigation as a tortfeasor, even though the payments are not from a collateral source.

Mrs. Overton was 65 years old or older in 1968. Apparently, she was not entitled to monthly cash benefits under section 202 of the Social Security Act when the Medicare legislation was passed and could not at that point accumulate the requisite quarters of coverage. Therefore, she did not meet the general eligibility criterion for Medicare hospital insurance. However, the government enacted a special transitional entitlement provision under which individuals such as Mrs. Overton would also be entitled to hospital insurance. 42 C.F.R. §§ 405.-103(a)(1)(i), 405.102(a)(3); *see* note 6 *supra.* This illustrates how inexact is the analogy between private insurance contracts and the Medicare program. Congress' purpose, to help older citizens on fixed incomes avoid the high cost of hospital care, overrode any quid pro quo contractual characteristics of its program. If one is constrained to follow the comparison to private insurance plans, one could say Mrs. Overton was unable to perform the "consideration" for coverage, and Congress chose to waive it. Whether Mrs. Overton's coverage therefore has less resemblance to a contractual benefit than that of other Medicare recipients, is less significant in balancing of the equities than the government's decision to treat her equally.

Under these circumstances, Mrs. Overton should not be treated differently than other recipients vis a vis the government in its present role as tortfeasor. Because the collateral source rule, particularly when applied in this context, is primarily a rule of substantial justice, I would not follow the analogy to private insurance so completely as to allow the government to use Mrs. Overton's benefits to mitigate its damage payment. Since Congress has given her the same status as any other Medicare recipient, we should not judicially change it.

---

1. This is also the basis on which the majority explains the holding in *Smith v. United States*, 587 F.2d 1013 (3rd Cir. 1978). The district court reasoned under *Smith* that deduction of Medicare benefits was precluded when applicable state law recognizes the collateral source doctrine. *Smith* does not mention any individual contribution made by the plaintiff, but characterizes social security as similar to insurance.