Clifford M. CARROLL, Jr., Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. No. H–79–1589.

United States District Court,
D. Maryland.

June 18, 1982.

Clifford J. Shoemaker, Washington, D.C.,
and James B. Hopewell, Landover, Md., for
plaintiff.

Steven A. Allen, Asst. U.S. Atty., Baltimore, Md., and Betsy Ginsberg, Dept. of
Justice, Washington, D.C., for defendant.

ALEXANDER HARVEY, II, District
Judge:

This is another of the many civil actions
brought by persons who received inocula-

tions pursuant to the National Swine Flu Immunization Act of 1976, 42 U.S.C. § 247b, and who later suffered from the serious neurological disorder known as Guillain-Barre Syndrome (hereinafter "GBS"). Clifford M. Carroll, plaintiff herein, received a swine flu shot on October 18, 1976. Many months later he was diagnosed as having contracted GBS. In this action, plaintiff is seeking substantial damages from the government under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, and the 1976 Swine Flu Act, 42 U.S.C. § 247b.

Suit was initially filed in this Court on August 27, 1979. Thereafter, this action was transferred by the Judicial Panel on Multidistrict Litigation to the United States District Court for the District of Columbia, pursuant to 28 U.S.C. § 1407. Following various discovery and other pretrial proceedings, the case was remanded to this Court on August 25, 1980. Further discovery was then undertaken by the parties and a pretrial conference was held. The case then came on for trial before the Court sitting without a jury. Numerous expert and other witnesses testified at the trial, and many exhibits were admitted in evidence.[1] Findings of Fact and Conclusions of Law under Rule 52(a), F.R.Civ.P., are contained in this opinion, whether or not expressly so characterized.[2]

### The Issues

The Final Pretrial Order entered by the United States District Court for the District of Columbia and applicable in this case provides that where the United States stipulates that a plaintiff has developed GBS at any time after receiving a swine flu vaccination, no theory of liability need be established by the plaintiff in order to recover damages. *See* Stipulation and Final Pretrial Order, ¶ IX; *see also In Re Swine Flu Immunization Products Liability Litigation*, 464 F.Supp. 949 (J.P.M.L.1979). In

this case, it has been stipulated that plaintiff contracted GBS after he received a swine flu vaccination. Therefore, plaintiff here need not prove negligence or other fault of the government to be entitled to recover damages. However, to be entitled to damages, plaintiff must here prove by a preponderance of the evidence that the swine flu vaccination which he received was the proximate cause of the GBS which he later contracted.

Plaintiff received an inoculation of swine flu vaccine on October 18, 1976, in Montgomery County, Maryland. However, it was not until December 9, 1977, when plaintiff was admitted to the Suburban Hospital in Bethesda, Maryland, that he was diagnosed as suffering from GBS. It is plaintiff's contention that shortly after receiving his swine flu shot in October 1976, he experienced symptoms indicating that he had then contracted GBS. Plaintiff asserts that GBS can assume several forms. Most persons contracting GBS have a rapid onset followed by a rapid recovery. Others, a small minority, contract a chronic form of GBS, in the course of which there can be a lengthy progression of the disease followed by a slow recovery. It is plaintiff's position that he suffered from the chronic form of GBS, which finally resulted in his hospitalization almost fourteen months after he was inoculated.

Although conceding that plaintiff had GBS in December of 1977 when he was hospitalized, the government contends that the antecedent event which caused plaintiff's neurological disorder was not the swine flu shot received by him some fourteen months prior to his hospitalization. Suggesting that an upper respiratory infection which plaintiff suffered in November 1977 was probably the antecedent event related to the onset of plaintiff's episode of GBS in December 1977, the government

---

1. On January 7, 1982, the fourth day of the trial, plaintiff became ill and could not continue. Since plaintiff had not as yet testified, the trial was suspended. The trial was resumed on April 1, 1982 and completed that same day.

2. At the request of the Court, the parties have submitted Proposed Findings of Fact and Conclusions of Law.

argues that in any event, plaintiff has not met his burden of proving that his flu shot proximately caused his GBS.

It is conceded by the government in this case that GBS can take two forms, the classic form in which the disease peaks generally one month after the onset of symptoms and a chronic form in which the syndrome evolves over a much more prolonged period and peaks at a date many months after the onset of the original symptoms. In other cases, the government has challenged the existence of so-called "chronic" or "relapsing" GBS.[3] In this particular case, the scientific evidence clearly establishes that one of the many forms of GBS, although relatively rare, is the slowly progressive, chronic or relapsing type. This evidence is not being challenged here by the government.

The issue is therefore considerably narrowed in this case. What the Court must here determine is the date of the onset of neurological symptoms experienced by plaintiff. If plaintiff experienced neurological symptoms during the ten weeks after he received his flu shot indicating that he had contracted GBS, he would be entitled to a recovery, even though his condition was not finally diagnosed until December of 1977. On the other hand, if no such symptoms were experienced or the symptoms described by the plaintiff were not such as to indicate that he was suffering from the chronic form of this neurologic disorder, then plaintiff will have failed in proving that the inoculation was the proximate cause of his contracting GBS. In deciding this ultimate issue, the Court must focus in particular on the events occurring in the life of Clifford Carroll and his family in the ten-week period after October 18, 1976, as well as on events which occurred during the spring and summer of 1977 and which might shed some light on the nature of the earlier events.

*Facts*

Clifford M. Carroll, Jr. was born on April 6, 1947, and he was therefore 29 years of age when he received his swine flu shot on October 18, 1976. In 1968, plaintiff married his wife, Sherri Ann, and they subsequently had two children, Shannon, who was 12 years of age at the time of the trial, and Nicholas, who was then 9 years of age.

For many years, plaintiff's father, Clifford M. Carroll, Sr., had been sexton at St. John's Episcopal Church in Chevy Chase, Maryland. In 1975, plaintiff succeeded his father at that position. As sexton of the church, plaintiff had various janitorial duties and was responsible for the general maintenance and upkeep of the church and of the school connected with it. Before October of 1976, plaintiff enjoyed excellent health and engaged in various athletic activities.

Within a week after receiving his swine flu shot, plaintiff experienced a tingling sensation in his legs and felt unusually tired. He told his wife that his legs hurt and that his hands did not want to work right. He and his wife were scheduled to go out to dinner the week after the flu shot to celebrate his mother-in-law's birthday. However, he was too tired to go out and his wife cooked at home.

During the latter part of October, he felt numbness in his hands and arms, and continued to feel fatigued. As he expressed it, "a hand would go to sleep," and it would take a long period of time before the affected limb would regain its normal sensation. Although he was able to continue to work, he did not carry his workload as well as he had previously.

During the late fall of 1976, plaintiff, because of his fatigue, did not engage in a number of his usual activities. On Halloween, October 30, 1976, plaintiff did not ac-

---

**3.** In *Thompson v. United States,* Civil No. 79–1017–A (E.D.Va., Memorandum Opinion dated November 6, 1980), the government had contended that there was no medical or scientific support for the existence of a slow developing GBS which did not manifest itself within a ten-week period. This contention was rejected by Judge Bryant who, after reviewing the scientific evidence, accepted the theory advanced by the plaintiff in that case that GBS can have a slow progression.

company his children on their usual trick-or-treat activities because he felt too tired. For the first time, his wife went out with the children on Halloween. By November of 1976, plaintiff had stopped playing basketball and football with his children because he was too tired. His wife noticed that he was doing his work much more slowly than previously. Ordinarily, plaintiff and his family would visit plaintiff's parents at Thanksgiving. However, plaintiff was too tired to make this visit during Thanksgiving 1976. Plaintiff and his father usually went hunting during the last week of the hunting season in Virginia, which was the first week of January. In mid-December of 1976, plaintiff told his father that he would probably not be able to go hunting that year because he did not feel up to it. On December 20, 1976, plaintiff was seen by his family physician, Dr. Donald Ekman, who diagnosed an upper respiratory infection and treated plaintiff accordingly. At Christmas of 1976, plaintiff did not, as he was accustomed to doing, visit his wife's parents with the rest of the family because he felt too tired.

During the spring and summer of 1977, plaintiff's feelings of fatigue continued. As in the fall of 1976, there were many family activities in which he did not participate because of his feelings of fatigue. On April 1, 1977, he saw Dr. Ekman, who diagnosed bronchitis and flu. During the spring and summer months, plaintiff's wife and parents assisted him in performing his duties as a sexton. On June 20, 1977, plaintiff again visited Dr. Ekman. At that time, plaintiff complained of being tired and fatigued, and of having difficulty in sleeping. Dr. Ekman examined him and performed a blood test, but did not refer plaintiff to a neurologist. In August of 1977, plaintiff, his family and his parents, took an automobile trip to the western part of the United States. Because of plaintiff's continuing fatigue, the trip was cut short. On September 23, 1977, plaintiff

was treated by Dr. Ekman for a sore throat.

On December 7, 1977, when plaintiff did not return home for lunch at his usual time, his wife went to look for him and found him sitting on the steps of the church, unable to stand up. She helped him home, and then called Dr. Ekman, who advised her to put plaintiff to bed and to call again in the morning if he had not improved by then. The next morning, plaintiff was obviously seriously ill, and he was taken by ambulance to Suburban Hospital, where he was admitted on December 9, 1977. At the hospital, plaintiff was seen by Dr. David Satinsky, who diagnosed his condition as GBS. On December 30, 1977, plaintiff was discharged from the hospital.

Since his release from the hospital, plaintiff has been completely disabled and has not been able to return to his prior or to any other employment. He has been hospitalized on several occasions since then, and at the time of the trial, he was confined in a wheelchair.

### Discussion

On the record here, this Court finds and concludes that plaintiff has met his burden of proving by a preponderance of the evidence that he would not have contracted GBS but for the swine flu inoculation he received on October 18, 1976. Plaintiff has therefore proved that the proximate cause of his injury was the swine flu shot.

GBS is an acute polyradiculoneuropathy, which results in a degeneration of peripheral nerves.[4] The medical experts agree that there are many causes of GBS. Following a substantial increase in the incidence of GBS in the United States after the swine flu immunization program of 1976, it has been recognized that a swine flu inoculation may cause GBS. GBS is an autoimmune disorder, in that mechanisms of the body designed to combat disease turn upon the body itself. Thus, GBS results when a person's own antibodies attack the

---

4. A full discussion of GBS and of expert testimony describing the nature of this disorder is contained in *Alvarez v. United States*, 495 F.Supp. 1188, 1194–1205 (D.Colo.1980). Several of the experts who testified in that case also testified here.

myelin sheath which protects the peripheral nervous system. This has been shown to be the result of some type of stimulation of the body's immune system, which can be caused by an inoculation, an upper respiratory infection or some similar event.

Epidemiologic studies performed by the Center for Disease Control in Atlanta, Georgia, and reported in an article by Dr. Lawrence Schonberger, show that there is a definite etiological relationship between the swine flu vaccine and GBS. According to Dr. Schonberger, this relationship extends for a period of some ten weeks. Dr. Schonberger's findings may be summarized as follows:

| INTERVAL IN WEEKS FROM VACCINATION TO ONSET OF NEUROLOGICAL SYMPTOMS | PERCENT CHANCE THAT GBS WAS CAUSED BY VACCINE |
|---|---|
| 1 (days 1 + through 7) | 79.0 |
| 2 | 92.2 |
| 3 | 93.5 |
| 4 | 82.0 |
| 5 | 75.6 |
| 6 | 52.0 |
| 7 | 61.5–75 |
| 8 | 56.5–57 |
| 9 | 48.7–49 |
| 10 | 46.5 |
| 11 | No relation, because the increased risk disappears |

Neurological symptoms of GBS include tingling, numbness of the extremities and weakness. These were all experienced by the plaintiff in the first few weeks after he was vaccinated. The evidence in this case therefore shows a clinical manifestation of GBS within several weeks after he received his shot. Moreover, during the ten-week period after October 18, 1976, plaintiff's symptoms continued and were accompanied by generalized fatigue, which is also recognized as a symptom of GBS. None of these symptoms had been experienced by plaintiff before he received his swine flu shot. They began shortly after the shot, and they continued off and on over a period of many months. In view of this evidence, this Court finds and concludes that as a result of the inoculation he received on October 18, 1976, plaintiff contracted a mild, chronic form of GBS which later developed into an acute form in December 1977.

In making these findings, this Court is relying heavily on the testimony of both plaintiff and his wife. The Court found both of them to be extremely credible witnesses. Moreover, their testimony was supported by that of plaintiff's mother and father, who confirmed many of the facts indicating that the plaintiff's onset of neurological symptoms occurred very shortly after he received the swine flu shot. The Court will further credit the testimony and opinions given in this case by Dr. Charles M. Poser. According to Dr. Poser, plaintiff had an unusual form of GBS.[5] Plaintiff's GBS was a slowly progressive type which later developed into a chronic, recurrent form. After considering the symptoms experienced by plaintiff after October 18, 1976, Dr. Poser was of the opinion that plaintiff's GBS was caused by the swine flu shot. His views will be accepted by the Court.

In seeking to discredit the testimony of plaintiff and his wife, the government relies on the fact that plaintiff was seen by his family doctor on several occasions after he received his vaccination, but did not relate his neurological symptoms to his family physician. The government contends that had plaintiff been ill with GBS after October 18, 1976, he would have con-

---

**5.** Dr. Satinsky confirmed that plaintiff had an    unusual case of GBS.

sulted his family doctor, would have described the symptoms to which he testified and would have been seen by a neurologist. However, as the evidence indicates, plaintiff was stoic in his approach to medical problems. The symptoms which he was experiencing in the fall of 1976 were puzzling ones which were not disabling to any great degree. Plaintiff had a mild and unusual form of GBS. Plaintiff did not associate his symptoms with a neurologic disorder and did not consult his family physician until he had acute symptoms indicating other ailments.

The evidence discloses that plaintiff was treated by Dr. Ekman on December 20, 1976 for an upper respiratory infection and again on April 1, 1977 for bronchitis and flu. It is argued that, since Dr. Ekman did not recall any discussion of neurological symptoms on those occasions and since his records support this testimony, plaintiff must not have been then experiencing the symptoms he has described in his testimony. Little weight will be given in this case to the testimony or the records of Dr. Ekman. He was a general practitioner with an extremely busy, volume practice. He was not a neurologist and was hardly equipped to diagnose a chronic form of GBS such as this one was. Dr. Ekman's record-keeping left much to be desired. According to Mrs. Carroll, plaintiff did tell Dr. Ekman when he visited him in June of 1977 that "his body ached like a toothache" and that "his hands get numb." These statements were not recorded in Dr. Ekman's notes. In view of his busy, family-type practice, Dr. Ekman could hardly have been expected to have given plaintiff the type of neurological examination which would have revealed the existence of this unusual type of GBS contracted by plaintiff in the fall of 1976.

For these reasons, this Court concludes that plaintiff is entitled to recover damages in this case.[6]

## Damages

Before he contracted GBS, plaintiff was in excellent health and engaged in various types of athletic endeavors with members of his family. He went hunting with his father and played basketball and football with his children. He had always been well able to perform the physical and other duties required of a church sexton.

The GBS contracted by plaintiff has had devastating effects on his activities and life style. His first hospitalization at Suburban Hospital lasted from December 9, 1977 until December 31, 1977, during which time he suffered from acute generalized weakness. He was treated with various drugs. Toward the end of his stay, he was started on physical therapy and began taking steps with a walker. Following outpatient physical therapy treatments, he was able to walk with a single cane until January of 1981 when he began getting weaker, especially in his legs. On July 7, 1981, he was again admitted to Suburban Hospital, at which time he was not able to walk even with the assistance of two canes. He was diagnosed as having suffered a relapse, was treated with drugs and was finally discharged on July 21, 1981. At the time of the trial, plaintiff was confined to a wheelchair. His condition will probably not improve in the future.[7]

6. In view of this Court's conclusion that plaintiff's symptoms in the fall of 1976 indicated that he had then contracted GBS, it is not necessary to consider the alternative theory presented by plaintiff in this case, based on the alleged presence of so-called P–2 protein in swine flu vaccine and of antibodies against P–2 protein in plaintiff's blood. The Court would note that in *Hausler v. United States*, Civil No. 79–2031–A (E.D.Va. Memorandum Opinion dated March 17, 1981), Judge Bryant rejected this theory as espoused by Dr. Edwin Eylar and Dr. Terrence Phillips, both of whom testified in this case.

7. As noted, this case was interrupted when plaintiff collapsed and was hospitalized on the fourth day of the trial. At first, it was thought that plaintiff had suffered a stroke. However, it later became apparent that the stress of the trial had caused plaintiff's collapse. The award being made by the Court has not been increased because of plaintiff's brief hospitalization in January of 1982.

When he received his flu shot, plaintiff was more than six months past his 29th birthday. The life expectancy of a 30-year old, white male is 42.8 more years.

■ In support of his claim for damages, plaintiff called Dr. Richard J. Lurito, an economist and formerly a Professor of Economics at Georgetown University. As sexton at St. John's Episcopal Church in Chevy Chase, Maryland, plaintiff had received both a salary and the free use of a house. Dr. Lurito used a figure of $11,000 as plaintiff's average salary for three prior years and added $2,300 for housing. These figures will be accepted by the Court, and $13,300 will be used as the base figure for computing lost income. Dr. Lurito used a 7.3% figure for a projected annual increase in plaintiff's income. This figure will likewise be accepted by the Court. However, Dr. Lurito used an 8% after-tax discount rate in determining the present value of plaintiff's future lost income. This figure will be rejected, and the Court will employ an average 12% figure, which is much more realistic at the present time when interest rates are high and are expected to remain high. Indeed, Dr. Lurito recalculated his figures based on a 12% after-tax discount rate, and concluded that plaintiff's lost net income would amount to $376,167. This figure will be accepted by the Court as representing plaintiff's lost net income, as discounted to present worth.

■ Plaintiff has likewise sought recovery for services of a home health aide for eight hours a day to attend to his needs. This item of claimed damages has not been proved. It has not been shown that any such special health care was ever used by plaintiff or that it was necessary. No evidence has been introduced to indicate that plaintiff has ever paid for the services of a home health aide since he contracted GBS. Other than those times when plaintiff was hospitalized or otherwise under a doctor's care, plaintiff's wife and family have been well able to attend to his daily needs.

A further item of damages sought by plaintiff is the cost of services which he claims he had regularly performed for his family. Once again, the proof has not been sufficient to establish plaintiff's entitlement to this item of damages. Under Maryland law, damages in a personal injury action must not be merely speculative in character but must be proved with reasonable certainty. *Adams v. Benson*, 208 Md. 261, 271, 117 A.2d 881 (1955). As to this particular item, plaintiff has not met this test. The hourly figures and the cost per hour used to compute plaintiff's claim for lost family services are much too speculative to be credited by the Court.

■ Finally, plaintiff claims damages for pain, suffering and emotional distress. In the Pretrial Order, plaintiff suggested an award of $400,000 for this item of damages. Certainly, plaintiff is entitled to a substantial award for pain and suffering. He is permanently confined to a wheelchair, and he requires assistance in his physical activities. It is not expected that his condition will improve in the future. Plaintiff has been hospitalized twice because of the GBS he contracted. He has experienced considerable pain over the years and great mental anguish. A healthy, hard-working family man before he contracted GBS, his life style has now changed drastically. On the record here, this Court finds and concludes that an appropriate award for the plaintiff's pain and suffering and for his permanent disability is $300,000. The total award is therefore $676,167.00.[8]

■ Defendant contends that any award made to plaintiff in this case should be reduced by the Social Security disability

**8.** In the Pretrial Order, plaintiff also claimed special damages in the amount of $2,205.19. However, no evidence was introduced at the trial to support this claim. Thus, in plaintiff's Proposed Findings of Fact and Conclusions of Law, no claim was made for an award of special damages.

payments he has received and will continue to receive from the government. This Court would disagree. The collateral source rule permits no such deduction. In *Smith v. United States*, 587 F.2d 1013, 1016 (3d Cir.1978), the Court held that where state law recognizes the collateral source doctrine, Social Security benefits should not be deducted from a recovery under the Federal Tort Claims Act (the FTCA). In so holding, the Third Circuit relied on rulings by the Fourth Circuit that benefits conferred by the United States out of a special fund need not be deducted from a FTCA recovery. *See United States v. Price*, 288 F.2d 448 (4th Cir.1961) and *United States v. Brooks*, 176 F.2d 482 (4th Cir.1949). After reviewing these decisions, this Court is satisfied that the Fourth Circuit, if presented with this question, would follow the *Smith* opinion and hold that no deduction should be made from the award to plaintiff because of Social Security benefits he receives.

*Overton v. United States*, 619 F.2d 1299 (8th Cir.1980), is not to the contrary. In that case, the Eighth Circuit distinguished *Smith* and held in a swine flu case brought under the FTCA that the government was entitled to a set-off for Medicare payments because the plaintiff had not made any contributions to the funds from which the Medicare payments were derived. In this case, plaintiff has indeed made contributions towards the Social Security benefits he is receiving. *Overton* recognized that there would have been no set-off in that case if (as here) the plaintiff had made contributions to the Medicare funds. *See Nightingale v. United States*, Civil Nos. 79–448–RE and 79–643–RE (D.Ore. Opinion dated January 17, 1980).

### Conclusion

For the reasons stated, judgment will be entered in favor of the plaintiff in the amount of $676,167.00, plus costs. The Clerk is directed to enter judgment accordingly.