**Lonnie F. TITCHNELL and Ella Titchnell**

v.

**UNITED STATES of America, Appellant.**

**No. 81–2394.**

United States Court of Appeals, Third Circuit.

Argued Feb. 19, 1982.

Decided May 28, 1982.

**166**

Mark B. Aronson (argued), Behrend, Aronson & Morrow, Pittsburgh, Pa., for appellees.

J. Alan Johnson, U. S. Atty., Pittsburgh, Pa., J. Paul McGrath, Asst. Atty. Gen., Mary Ann Murphy, Jeffrey Axelrad (argued), Attys., Civ. Div., U. S. Dept. of Justice, Washington, D. C., for appellant.

Before ADAMS and SLOVITER, Circuit Judges, and VanARTSDALEN,* District Judge.

## OPINION OF THE COURT

VanARTSDALEN, District Judge.

This is an appeal from a judgment entered in favor of the plaintiffs, Lonnie F. Titchnell and Ella Titchnell, his wife, on a medical malpractice cause of action for negligent administration of a swine flu immunization inoculation provided to Mr. Titchnell pursuant to the National Swine Flu Immunization Program of 1976, 42 U.S.C. §§ 247b(j)–247b(*l*) (1976). The judgment will be affirmed.

■ Pennsylvania case law requires a plaintiff in a medical malpractice action to prove by expert testimony (1) the prevailing standard of medical care accepted by the medical profession, and (2) that the care provided plaintiff deviated from and fell below such accepted standard. Among the witnesses who testified in this case as to medical practices were the following: (1) the supervising nurse at the Suismon Street Clinic, where Mr. Titchnell received the inoculation; (2) a district health officer of the Allegheny County Health Department who had administrative and supervisory duties in respect to the swine flu immunization program provided at several Allegheny County Public Health Clinics, including the Suismon Street Clinic; (3) a psychiatrist; (4) an internist-pathologist; and (5) a neurologist. In addition, the Allegheny County Health Department's *Guidelines for Mass Clinics for the General Population and District Office Clinics for the High Risk Popu-*

---

* Honorable Donald W. VanArtsdalen, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

*lation (Guidelines)* applicable to the swine flu immunization program were received in evidence.

Although no physician or other witness testified by way of expert opinion as to the precise standard of medical care or practice that was due to Mr. Titchnell in the administration of the inoculation, we conclude that the cumulative testimony of expert and nonexpert witnesses as to prevailing practices was sufficient for a fact finder to ascertain the degree of care required by those administering swine flu inoculations, and to further find that the care provided deviated from and fell below standard practice.

On November 15, 1976, plaintiff Lonnie Titchnell, age 71, and his wife, plaintiff Ella Titchnell, age 61 drove to the nearby Suismon Street Clinic, operated by the Allegheny County Health Department, to receive swine flu vaccine inoculations pursuant to the National Swine Flu Immunization Program of 1976.

Mr. Titchnell, at the time of the clinic visit, was being treated regularly by his own physician, Lawrence Brent, M.D., for a rapid pulse and high blood pressure. Mr. Titchnell had suffered two minor cerebrovascular accidents (commonly referred to as "strokes") but had successfully recovered from both. In addition, he had both coronary and cerebral arteriosclerosis. He was apprehensive about receiving the swine flu vaccine, but Dr. Brent had told him it "was advisable."

On arrival at the clinic, the Titchnells entered a reception room where they were given a sheet of paper entitled "Important Information about Swine and Victoria Influenza (Flu) Vaccine (Bivalent)." The form described the symptoms of the flu, the function and possible side effects of the vaccine, and contained a section entitled "Special Precautions" which provided:

As with any vaccine or drug, the possibility of severe or potentially fatal reactions exists. However, flu vaccine has rarely been associated with severe or fatal reactions. In some instances people receiving vaccine have had allergic reactions. You should note very carefully the following precautions:

Children under a certain age should not routinely receive flu vaccine. Please ask about age limitations if this information is not attached.

People with known allergy to eggs should receive the vaccine only under special medical supervision.

People with fever should delay getting vaccinated until the fever is gone.

People who have received another type of vaccine in the past 14 days should consult a physician before taking the flu vaccine.

*If you have any questions about flu or flu vaccine, please ask.*

Plaintiffs' Exhibit 12.

The receptionist asked Mr. and Mrs. Titchnell whether they were allergic to eggs. She did not ask any other questions or take any medical history from them. She handed them a paper entitled "Registration Form" which provided:

*I have read the above statement about swine flu, the vaccine, and the special precautions. I have had an opportunity to ask questions, including questions regarding vaccination recommendations for persons under age 25, and understand the benefits and risks of flu vaccination. I request that it be given to me or to the person named below of whom I am the parent or guardian.*

Plaintiffs' Exhibit 12.

After receiving the forms, Mr. and Mrs. Titchnell sat down and signed them. They then entered another room where there were two lines of people. The plaintiffs stood in one of the lines for about ten minutes awaiting their turn. Chairs were available had they chosen to sit down, but Mr. and Mrs. Titchnell did not do so. The plaintiffs could view the vaccine being administered to those people waiting ahead of them. While in line, Mr. Titchnell expressed some reservations, but his wife insisted that he receive the injection.

The nurse who administered the vaccine did not ask any questions of the plaintiffs.

There was no physician in attendance. The nurse took the signed forms from the Titchnells and administered the vaccine while the plaintiffs were standing. Each received the bivalent vaccine in the left arm by hypodermic injection.[1] The nurse instructed the plaintiffs to proceed to another room—the resting room—and to wait there for a period of time.

During the waiting period, the Titchnells were upset by off-hand comments made by another person who had been inoculated. They also observed an episode of fainting by a young man who had received the vaccine. After waiting a short period of time, Mrs. Titchnell suggested that they leave the clinic. Mr. Titchnell said "No," that he wanted to sit a while longer because his head felt numb. They sat for approximately ten more minutes, whereupon Mrs. Titchnell repeated her suggestion. The couple left the clinic and took a five-to-ten minute walk outside the clinic because Mr. Titchnell wanted "to get his blood circulating." Following the walk, Mr. Titchnell drove the car home with his wife as a passenger.

The next day Mr. Titchnell was admitted to Allegheny General Hospital, having suffered during the night or early morning a third cerebrovascular accident which was severe in its consequences. Following a long course of hospitalization and rehabilitation, Mr. Titchnell remains severely impaired. He is confined for the most part to a wheelchair and is unable to speak.

The plaintiffs filed this action in the United States District Court for the Western District of Pennsylvania, seeking recovery on theories of negligence and the government's alleged failure to obtain a proper informed consent. The action was transferred by the Judicial Panel on Multidistrict Litigation to the United States District Court for the District of Columbia for coordinated and consolidated pretrial proceedings. Following completion of those proceedings, the action was remanded to the Western District of Pennsylvania for local discovery and trial.

Trial was held nonjury and judgment entered on May 19, 1981, in favor of the plaintiffs. The trial court determined that the clinic personnel were negligent in not taking a medical history from Mr. Titchnell or ascertaining his past medical history. If such a history had been obtained, the court found that good medical practice would have dictated that the vaccine be administered, if at all, while Mr. Titchnell was lying down. Failure to do so, the court held, was the proximate cause of Mr. Titchnell's cerebrovascular accident. The court did not decide the issue of informed consent. The plaintiffs were awarded $219,858.62 in damages. The government appeals that judgment and award.

Under the National Swine Flu Immunization Program of 1976 (Swine Flu Act), Pub. L.No. 94–380, § 2, 90 Stat. 1113 (codified at 42 U.S.C. §§ 247b(j)–247b(*l*) prior to the enactment of the Health Services and Centers Amendments of 1978, Pub.L.No. 95–626, § 202, 92 Stat. 3574), Congress established a procedure for the filing and determination of all claims alleging personal injury or death arising out of the administration of the swine flu vaccine.[2] The Swine Flu Act provides that the United States

---

1. Persons over 65 years of age were to receive bivalent inoculations by hypodermic injection, and were not to be injected by jet injector guns. *Guidelines*, Plaintiff's Exhibit 12.

2. The Swine Flu Act was Congress's hurried response to a perceived threat of an imminent nationwide swine flu epidemic. *Hunt v. United States*, 636 F.2d 580, 589–90 (D.C.Cir.1980); *Barnes v. United States*, 516 F.Supp. 1376, 1378–79 (W.D.Pa.1981); *Wolfe v. Merrill Nat'l Laboratories, Inc.*, 433 F.Supp. 231, 233 (M.D. Tenn.1977); *Sparks v. Wyeth Laboratories, Inc.*, 431 F.Supp. 411, 415 (W.D.Okla.1977). *See generally* 122 Cong.Rec. 26, 793–817

(1976). In order to make the program operational, and in response to the reluctance of insurance companies to provide liability coverage to the drug manufacturers involved in the program. Congress provided that all claims should be brought directly against the United States. The Swine Flu Act reserves the right of the United States to recover that portion of any damages which may be awarded resulting, *inter alia*, from any negligent conduct on the part of any program participant in carrying out any obligation or responsibility in connection with the program. 42 U.S.C. § 247b(k)(7).

shall be liable for all such claims based upon the act or omission of a program participant [3] in the same manner and to the same extent as the United States would be liable in any action brought against it under 28 U.S.C. § 1346(b) (1976) and the related tort claims procedures of the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (1976). The Swine Flu Act further provides that state law shall be applicable in actions brought thereunder.

> [T]he liability of the United States arising out of the act or omission of a program participant may be based on any theory of liability that would govern an action against such program participant under the law of the place where the act or omission occurred, including negligence, strict liability in tort, and breach of warranty. . . .

42 U.S.C. § 247b(k)(2)(A)(i). *See also* 28 U.S.C. § 1346(b). The remedy against the United States is exclusive of any other civil action or proceeding against any employee of the Government or program participant whose act or omission gives rise to a claim. 42 U.S.C. § 247b(k)(3).

■ Understandably, at the trial, counsel, the parties and the trial judge concentrated primarily on the very close and factually difficult issue of causation. The trial court heard extensive testimony from medical experts as to whether, given Mr. Titchnell's medical history, the procedures followed by clinic personnel in administering the swine flu vaccine to him were the proximate cause of his subsequent cerebrovascular accident. The testimony was highly technical and the matter vigorously contested. The court relied on the Pennsylvania Supreme Court case of *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280 (1978), in concluding that the plaintiffs had met their burden of proof as to causation. On review of the entire record, we cannot conclude that the trial court's finding—that Mr. Titchnell's stroke was proximately caused by the administration of the vaccine—was clearly erroneous.

Acceptance of the trial court's finding as to causation, however, does not end the inquiry. The plaintiffs in this medical malpractice action, under Pennsylvania case law, have the burden of proving that the care given to Mr. Titchnell by clinic personnel, including the failure to take or obtain a medical history and the administration of the vaccine while Mr. Titchnell was standing, "fell below the standard of care owed him." *Brannan v. Lankenau Hospital*, 490 Pa. 588, 595, 417 A.2d 196, 199 (1980). This burden exists apart from the burden of proving causation. Pennsylvania courts have consistently held that, in a medical malpractice action such as this one, a plaintiff must establish by expert testimony the recognized standard of care and that the care or treatment rendered fell below such standard.

Expert testimony serves to establish the measure of professional skill required of the defendant under the circumstances of a given case. While there is no *per se* requirement for expert testimony in all cases of medical malpractice, the facts of the case before us do not permit an inference of negligence without adequate expert testimony. *See Jones v. Harrisburg Polyclinic Hospital*, 496 Pa. 465, ——, 437 A.2d 1134, 1138 (1981) (application of the doctrine of *res ipsa loquitur* in medical malpractice actions). In the instant case there is no fund of common knowledge as to the administration of swine flu vaccine from which a non-expert fact finder could infer negligence nor any expert testimony that the stroke would not have occurred absent negligence. *See id.*

---

**3.** "Program participant" is defined in the Act as:

> the manufacturer or distributor of the swine flu vaccine used in an inoculation under the swine flu program, the public or private agency or organization that provided an inoculation under the swine flu program without charge for such vaccine or its administration and in compliance with the informed consent form and procedures requirements . . . and the medical and other health personnel who provided or assisted in providing an inoculation under the swine flu program without charge for such vaccine or its administration and in compliance with such informed consent form and procedures requirements.

42 U.S.C. § 247b(k)(2)(B).

In *Powell v. Risser*, 375 Pa. 60, 99 A.2d 454 (1953), the court stated:

The duties imposed by law on the defendant physicians are to employ such reasonable skill and diligence as is ordinarily exercised in their profession. . . .

It has been uniformly held that expert testimony is necessary to establish negligent practice in any profession. . . .

[T]o make out a case, the plaintiff must show by expert testimony that there was a deviation from proper practices in the administration of the [medical treatment]. . . .

*Id.* at 65–67, 99 A.2d at 456 (citations omitted).

In *Scacchi v. Montgomery*, 365 Pa. 377, 75 A.2d 535 (1950), the court stated:

The plaintiff had the burden of proving [the doctor's] negligence and in a case such as this it could be proved only by expert testimony to establish negligence in the operation or a procedure which was not in accord with standard medical practice. . . .

*Id.* at 379, 75 A.2d at 536 (1950) (citations omitted).

A long and uniform line of cases from the Supreme Court of Pennsylvania has firmly established that expert testimony is required to establish the recognized standard of care and that there was a deviation from that standard.[4]

Our inquiry, then, must be directed to determining whether the expert testimony presented at trial was sufficient to establish the standard of care required of Suismon Street Clinic personnel in administering the swine flu vaccine and whether the care given to Mr. Titchnell deviated from and fell below that standard.

■ In measuring the degree of skill required of a physician and other professional medical personnel, the law does not demand "extraordinary skill . . . but that degree which ordinarily characterizes the profes-

sion. And in judging of this degree of skill . . . regard is to be had to the advanced state of the profession at the time." *McCandless v. McWha*, 22 Pa. 261, 269 (1853). The basic tenets of *McCandless* have been refined but not altered by the passage of time. In *Donaldson v. Maffucci*, 397 Pa. 548, 156 A.2d 835 (1959), the Pennsylvania Supreme Court reiterated the principle set forth in *McCandless*:

A physician who is not a specialist is required to *possess* and *employ* in the treatment of a patient the skill and knowledge usually possessed by physicians in the same or a similar locality, giving due regard to the advanced state of the profession at the time of the treatment; and in employing the required skill and knowledge he is also required to exercise the care and judgment of a reasonable man.

*Id.* 397 Pa. at 553–54, 156 A.2d at 838 (emphasis supplied by the court).

■ In the instant case, the district court concluded that, based upon the testimony of the plaintiffs' experts, the clinic personnel should have obtained a partial medical history of Mr. Titchnell and that, having knowledge of such medical history, Mr. Titchnell should have been lying down when the vaccine was administered to him. After a careful review of the record, we conclude that the plaintiffs offered sufficient expert medical testimony to establish the measure of professional skill required of clinic personnel in the administration of swine flue vaccine pursuant to the mass immunization program. More specifically, expert testimony at trial was adequate to prove that the failure to ask routine questions of Mr. Titchnell before administering the swine flu vaccine to him deviated from standard medical practice at the time.

There is no direct expert testimony or other direct evidence in the record that standard medical practice required taking

---

4. *See Brannan, supra* at 595, 417 A.2d at 199; *Chandler v. Cook*, 438 Pa. 447, 471, 265 A.2d 794, 796 (1970); *Lambert v. Soltis*, 422 Pa. 304, 309–10, 221 A.2d 173, 175 (1966); *Robinson v. Wirts*, 387 Pa. 291, 295–96, 127 A.2d 706, 708– 09 (1956); *Powell v. Risser*, 375 Pa. 60, 65–67, 99 A.2d 454, 456–57 (1953); *Scacchi v. Montgomery*, 365 Pa. 377, 379, 75 A.2d 535, 536 (1950); *Bierstein v. Whitman*, 360 Pa. 537, 541, 62 A.2d 843, 845 (1949).

or obtaining a medical history of Mr. Titchnell or any other person prior to administering the vaccine. There is direct evidence, however, that additional oral questions should have been asked of Mr. Titchnell, which, if asked, might reasonably have led the Clinic to obtain a further medical history and/or take additional precautions in administering the inoculation. We recognize that the evidence as to the appropriate standard of care is not as positive and precise as pronouncements of the Supreme Court of Pennsylvania would seem to require of a successful plaintiff. We are convinced, however, that the Supreme Court of Pennsylvania, if presented with a case under state law having the identical factual scenario as that of the instant case, would sustain a verdict rendered in favor of a plaintiff.

The government has contended that affirming the judgment would establish, as a matter of law, that in a mass immunization program individual medical histories must be taken of persons before being inoculated. We think the government overstates the holding of the trial court. In the bench opinion, the trial judge stated:

> [W]e find that the defendant in failing to make proper inquiries regarding Mr. Titchnell's health and hence failing to use proper precautionary procedures in administering the swine flu shot to him deviated from, acceptable standards of medical practice.... [H]ad a proper history been taken of Mr. Titchnell, the clinic personnel should then have taken certain precautionary measures before administering the shot to Mr. Titchnell. Appendix at 872–76.

The *Guidelines* adopted by the Allegheny County Health Department required certain specific oral inquiries be made of persons prior to being inoculated.[5] The district health officer, Edna Goerner, testified that asking only if the person was allergic to eggs "would be a deviation" from standard procedure, and that she "couldn't conceive" of any circumstances where such would be the sole oral inquiry. The clinic supervising nurse testified that asking only the single question was "not right" and was not in accord with the instructions she had given. Although it is apparent that any answers that Mr. Titchnell would have given to the inquiries suggested by the *Guidelines* would not in and of themselves have mandated any additional or alternative precautions or procedures, the manner of response or possible additional questions Mr. Titchnell might have asked could have placed Clinic personnel on notice of a need for special care. The trial judge's finding that "had a proper history been taken ... the clinic personnel should then have taken precautionary measures" is not clearly erroneous. A proper medical history within the meaning of the district judge's decision does not necessarily mean a full and complete personal medical history. The *Guidelines* and testimony of clinic personnel established that oral questions that should have been

---

5. The guidelines of the Allegheny County Health Department, pertaining to procedures at the county's swine flu immunization clinics, stated the following:

4. Ascertain that the vaccine (or his guardian) understands the Information/Registration Form by asking the following questions:
  a. Do you understand the form which you have read and signed? (If the answer is "NO," you should answer his questions. If you are unable to answer a question, refer the individual to the Medical Screener).
  b. Do you have a chronic heart, lung, liver or kidney disease or diabetes? Are you 65 or older? (If he answers "YES" to either question, make certain he has filled out a Blue Bivalent Registration Form. If there is any question, refer the individual to the Medical Screener.)

  c. Are you less than 18 years of age? Do you have any other medical questions? Are you allergic to eggs? Do you have a fever? Have you received measles vaccination within the past 14 days or a vaccination containing diptheria, pertussis, or tetanus antigens within the last 24 hours? (If the answer to any of these last 5 questions is "YES," the vaccinee should take his entire form with him to the Medical Screener's table to be double checked.)
  If the answers to all of these last 5 questions are "NO", direct vaccinee to the appropriate vaccine stations. (Persons 65 and over and other High Risk persons 18 through 65 with a Blue Bivalent Registration Form should *not* be directed to the Jet Injector Gun Line.)
*Guidelines*, Plaintiffs' Exhibit 12.

asked were not asked. Upon this, a fact finder could and did predicate a finding of negligence, a deviation from standard accepted medical practice.

The plaintiffs called three expert witnesses during the course of the trial. Arthur C. Walsh, M.D., and Leonard Merkow, M.D., testified during the plaintiffs' case-in-chief. James Rosen, M.D., was called by the plaintiffs as a rebuttal witness. The defense called one expert witness, Henry G. Higman, M.D.

Dr. Walsh, a psychiatrist with a background as a general practitioner, testified primarily as to the causal relationship between the swine flu vaccine administered to Mr. Titchnell and the injuries suffered by him. Dr. Walsh did, however, testify briefly as to his opinion concerning the care given Mr. Titchnell: "I took the swine flu vaccine myself and you're supposed to take it sitting down and wait for 15 minutes." Appendix at 346.

Dr. Walsh classified persons over 65 years of age as "high risk" and stated "we ought to take special pains with these people and make sure they're protected as much as possible...." Appendix at 393. He continued:

> Because of this what I feel is a high risk, we should take special pains with these people to maintain the cerebral circulation and they should either be given the injection when they're lying down or at least sitting down and if they have any dizziness, they should immediately sit down to keep that flow going.

> Q Then it is your opinion that as you understand the events of November 15, 1976 when Lonnie Titchnell went for the swine flu shot that he was not given the degree of care as a high risk person that he should have been given?

> ....

> A Yes.

Appendix at 393–94.

This testimony provides the opinion of Dr. Walsh, a practicing psychiatrist, as to how Mr. Titchnell "should" have been treated. Whether this opinion was formulated against the background of the relevant standard of medical care existing at the time or whether Dr. Walsh was familiar with the accepted standard of care is not specifically set forth in the testimony. A reasonable inference is, however, that Dr. Walsh was referring to what normal, skilled, professional clinic personnel were required to do.

Dr. Merkow, an internist-pathologist, testified extensively as to causation, but gave some testimony as to the standard of care provided Mr. Titchnell. He testified that the procedure used at the clinic was "poor," that the care provided Mr. Titchnell was not the "proper procedure for anybody" and that "a more adequate history should have been taken." Although he was a practicing physician in the Allegheny County area at the time, Dr. Merkow's testimony is not expressly stated to be predicated upon his knowledge of the accepted medical practice. He based his opinion to a substantial extent upon the failure of clinic personnel to make the oral inquiries set forth in the *Guidelines*. The *Guidelines*, of course, do not in and of themselves establish the accepted standard of care. They may have been more or less stringent than required by accepted standard medical practice. They do, nevertheless, provide relevant evidence as to what the standard practice was within all of the clinics in Allegheny County.

Other witnesses testified that the habit and routine practice of the Suismon Street Clinic in administering the swine flu vaccine was in compliance with the Allegheny County Health Department *Guidelines*. The court below accepted as fact, however, the testimony of Mrs. Titchnell as to the actual care given her husband. It is apparent from her testimony that the care given Mr. Titchnell deviated from the standards in the *Guidelines* which served as the routine practice for the clinic. In addition to serving as a basis for Dr. Merkow's opinion, deviation from routine clinic practice was given considerable weight by the court below in its determination that the defendant was liable for malpractice. Although there

is no direct evidence to establish that the clinic's routine practice corresponded to the standard of care recognized by the profession at the time, the trial court could so find.

It is both proper and desirable that health care facilities promulgate guidelines and define responsibilities for their own personnel. Such guidelines serve to orient and instruct personnel as to their responsibilities and, further, help assure consistency in the high quality of health care rendered. It may reasonably be expected that such procedures will, at a minimum, conform to the recognized standard of care at the time the guidelines are promulgated. Mere failure to act in accordance with one's own internal procedures, however, will not automatically thereby render a health care facility negligent. If a health care provider's own procedures fall short of meeting the recognized standard of care, rigid conformity to those internally-generated procedures will not serve to shield against liability. Conversely, if a health care facility, in striving to provide optimum care, promulgates guidelines for its own operations which exceed the prevailing standard, it is possible that care rendered at that facility by an individual practitioner on a given occasion may deviate from and fall below the facility's own standard yet exceed the recognized standard of care of the medical profession at the time. A facility's efforts to provide the best care possible should not result in liability because the care provided a patient falls below the facility's usual degree of care, if the care provided nonetheless exceeds the standard of care required of the medical profession at the time. Such a result would unfairly penalize health care providers who strive for excellence in the delivery of health care and benefit those who choose to set their own standard of care no higher than that found as a norm in the same or similar localities at the time. The trial court concluded, however, that in this case deviation from clinic routine constituted a deviation from the relevant accepted standard of care. The court's conclusion was not clearly erroneous.

The defendant called only one expert witness, Henry Higman, M.D., a neurologist. He testified almost exclusively as to causation, but did address briefly the question of the appropriate standard of care owed to Mr. Titchnell:

THE COURT: Do you agree with Dr. Merkow that it would have been better medical practice to administer the shot to a man with the plaintiffs' medical history lying down rather than standing?

THE WITNESS: Well, if the patient actually expressed great fear and apprehension and was at that age, I think it probably should have been administered sitting or lying.

Appendix at 657.

The plaintiffs called Dr. Rosen, a neurologist, on rebuttal. While his testimony, like that of all other expert witnesses at the trial, was directed almost entirely to the difficult issue of causation, he did devote some attention to the issue of the quality of care given to Mr. Titchnell:

THE COURT: Would it have been good medical practice to take the patient's history, medical history in situations where you have an older person such as Mr. Titchnell who was 71 at the time of the vaccine was administered, would that have been good medical practice to take the medical history of recipients in his category?

THE WITNESS: Yes. If you don't think I'm out of order, I participate in the blood collection program that we have in Greensburg from the Johnstown Blood Bank and we specifically—We have hundreds of paramedical and volunteer people who take the history and do all the work but we always have a doctor sitting right there and any time they get an abnormal historical fact, they come right over to us and ask us so I think that would have been the proper way to do it. I have no idea how they did it but they should have had a medical screening of some sort and a doctor there when he or his wife said yes, I have had high blood pressure and I have taken medicine and I have had a stroke and they should have

taken the guy right in the room and said: Should we give the guy a shot?

. . . . .

[By counsel for the plaintiffs:]

Q   I want you to assume that Mr. and Mrs. Titchnell when they went into the clinic were asked a question and that question was, "Are you allergic to eggs?" And that they were not asked any other question. Do you have an opinion whether that is a proper taking of a history?

. . . . .

A   No, I think that would be grossly inadequate.

Appendix at 757–60.

The question directed to Dr. Rosen by the court was aimed at eliciting a response as to whether the care given Mr. Titchnell was in conformity with "good medical practice." The question by plaintiffs' counsel asked for an opinion as to "proper" taking of a history. Although Dr. Rosen failed to articulate in a precise fashion the standard by which he measured the care given Mr. Titchnell, he stated that the practice at a blood collection program with which he was familiar was to take medical histories. The blood collection program served at least in part as the basis for his opinion. Although Dr. Rosen failed to testify that the standard of care at the time for swine flu vaccine administration corresponded or should have corresponded with the practice at the particular blood collection program with which he was familiar, the trial court could properly so conclude. Dr. Walsh's opinion was based on his assumption that Mr. Titchnell was a "high risk" person in part because he disclosed in answer to the written questionnaire that he was over 65 years old. Dr. Merkow's opinion was qualified by "for a patient who was his age and a high risk and with his history" (Appendix at 427), and further by "[i]f a history were obtained." Dr. Rosen's opinion was that it would have been good medical practice to take a history (Appendix at 757) and that it would have been good medical practice "in view of his medical history to have him lie down." Appendix at 758. In the context of this case,

the trial court could properly equate a physician's opinion as to what was "good medical practice" as the acceptable standard of care.

Defendant has argued that it would be unrealistic, unreasonable and counter-productive to impose upon participants in a mass immunization program a duty to obtain individual medical histories of each vaccine recipient. Under Pennsylvania law, assuming adequate proof by qualified expert testimony that the proper and accepted standard of care mandated the taking of individual histories, deviation from such standard could be determined by a fact finder to be negligence. In this case, however, there is no need to rule on the trial court's implicit finding that "clinic personnel should have taken" individual medical histories of each vaccine recipient. Appendix at 871. We are concerned only with the failure to take a more complete history from Mr. Titchnell. There is adequate proof that accepted medical practice required at least some additional oral inquiries directed to him, the results of which should have led to further precautions in administering the vaccine.

█   The trial judge expressly included in the award of damages the sum of $22,158.76 for medical expenses incurred by Mr. Titchnell. The defendant takes exception to this part of the award contending that, since 80% of these expenses were paid by the United States under Medicare Part A and Part B coverages, the award of medical expenses provides Mr. Titchnell with a double recovery from the government. The issue raised by the appellants is whether Medicare Part A and Part B payments are from a "collateral source" when the government is held liable for a negligently administered swine flu inoculation and the evidence establishes that the plaintiff has contributed to Medicare. We conclude that such payments are from a "collateral source" under the law of Pennsylvania.

█   Pennsylvania, as well as many other states, permits an injured party to recover medical expenses from a tort-feasor, not-

withstanding reimbursement of such expenses by the injured party from a third party, if such reimbursement is from a "collateral source" and not from the tort-feasor. Frequently such payments are from health and accident insurance policies carried by or on behalf of the injured party. Under Pennsylvania law, evidence of receipt of such payment is not admissible in a trial for recovery of damages against a tort-feasor. *Trump v. Capek*, 267 Pa.Super. 355, 406 A.2d 1079 (1979).

The defendant concedes that Medicare Part A is largely financed from compulsory taxes.[6] However, the defendant contends that, since Medicare Part B is financed from premium payments by enrollees together with contributions from funds appropriated by the federal government,[7] the payments received by Mr. Titchnell were not from a "collateral source."

In *Smith v. United States*, 587 F.2d 1013 (3d Cir. 1978), this Court held that Social Security Survivor benefits paid a widow and children should not be deducted from the widow's damages award from the government under the Federal Tort Claims Act (FTCA). This decision followed *United States v. Harue Hayashi*, 282 F.2d 599 (9th Cir. 1960), in which the Ninth Circuit held that payment for awards under FTCA come out of unfunded general revenues of the United States whereas Social Security benefits come from a special fund supplied in part by social security tax payments made by the beneficiary or a relative upon whom the beneficiary is dependent. *Id.* at 603–04. In *Smith*, this Court stated that "FTCA recoveries come out of general revenues; Social Security benefits are funded almost entirely from employee and employer contributions."[8] 587 F.2d at 1016.

The Fourth Circuit apparently is in accord with the rationale of the Third and Ninth Circuits. It held that benefits paid out of a "special fund" need not be deducted, specifically holding in *United States v. Price*, 288 F.2d 448 (4th Cir. 1961), that benefits under the Civil Service Retirement Act were a collateral source; and in *United States v. Brooks*, 176 F.2d 482 (4th Cir. 1949), National Service Life Insurance Policy benefits were not deductible from an FTCA damage award.

Somewhat at divergence with *Smith* stands the Tenth Circuit's decision in *Steckler v. United States*, 549 F.2d 1372 (10th Cir. 1977), which held that Social Security payments, to the extent traceable to contributions by the worker and employers constitute a "collateral source," but that a claimant had the burden of making "some effort to ascertain the percentage or part contributed by the government ... so as to permit a determination of the contributions of the employer and employee and their exclusion as collateral sources." *Id.* at 1379. In *Smith*, this Court, analyzing *Steckler*, stated:

> Nevertheless, we are constrained to note our disagreement with the Tenth Circuit in *Steckler*, ... and decline therefore to adopt its approach. We believe that the government's payments are so minimal and so difficult to trace that such an approach would be impractical.

*Smith, supra*, 587 F.2d at 1016 (footnote omitted).

The Eighth Circuit in *Overton v. United States*, 619 F.2d 1299 (8th Cir. 1980), held, under the applicable "collateral source" rule of Missouri, that Medicare Part A payments received by a widow had to be deducted from the widow's "swine flue" damage

---

**6.** *See* 42 U.S.C. § 1395i(a) (1976).

**7.** *Id.* § 1395j.

**8.** In *Feeley v. United States*, 337 F.2d 924 (3d Cir. 1964), this court held that the plaintiff was not entitled to both Veterans' Administration hospital benefits and Federal Tort Claims Act recovery since both came out of the general revenues of the United States. In *Smith*, the narrowness of this holding was again recognized. "This decision casts neither approval nor disapproval on such possibly distinguishable situations as where the payment is out of a specially funded source ... or where the plaintiff has paid a part or all of the premiums necessary to establish the source or fund." *Smith v. United States*, 587 F.2d at 1015, *quoting Feeley v. United States*, 337 F.2d 924, 934 (3d Cir. 1964) (citations omitted).

award. *Overton* is factually distinguishable from the present case in a critical respect. *Overton* noted that the issue in that case was "whether the district court erred in concluding that the Medicare benefits of a *noncontributing* recipient should be considered collateral to his FTCA damage award." *Id.* at 1305 (emphasis added). The Court ruled that it was essential that plaintiff "show he has contributed to the fund he claims as a collateral source." *Id.* at 1305–06. Because the record failed to reveal that either plaintiff or her deceased husband had "paid any of the taxes that determine the level of appropriations for the Part A [Medicare] trust fund" and because both were over age 65 when Medicare legislation was enacted, the inclusion of the Medicare payments in the damage award was held improper notwithstanding the "collateral source" doctrine. *Id.*

In the present case, the trial court found that Mr. and Mrs. Titchnell maintained the maximum Medicare coverage and that Medicare payments were deducted from Mr. Titchnell's monthly social security check. Thus, Mr. Titchnell did contribute directly to the Medicare Part B trust fund. Moreover, there is evidence from which we can infer that Mr. Titchnell contributed indirectly to the Medicare Part A trust fund. Presumedly, Mr. Titchnell paid social security taxes during the time he was self-employed. It is these revenues which determine the level of appropriations from the treasury to the trust fund for Medicare Part A. Therefore, since the plaintiffs have shown that they have contributed to the funds which they claim to be collateral, the trial court properly refused to reduce the damage award to the extent that these medical expenses were reimbursed by Medicare.

The government did not argue that the plaintiffs' award of damages should be reduced by that portion of Medicare Part A and Part B benefits attributable to contributions by the government from the general treasury revenues. In *Smith*, we expressed our disagreement with the Tenth Circuit's decision in *Steckler, supra,* which placed the onus on the plaintiff to make some effort to ascertain the percentage or part contributed by the government to the Social Security fund. In *Overton*, the Eighth Circuit noted its acceptance of the view expressed in *Smith.*

> [I]t would seem that the burden of demonstrating the proportion of plaintiff's collateral benefit that is due to general taxation instead of special levy or fee should be upon the government, not the plaintiff, since the government has the benefit of the set-off and is presumably in the best position to marshal the relevant data.

*Overton v. United States, supra,* 619 F.2d at 1309 n.16. Whether or not the government is entitled to a partial set-off to the extent that Medicare benefits received by Mr. Titchnell are attributable to government contributions to the Medicare fund need not be decided since the government has not raised this issue and no evidence on this issue was presented to the trial court.[9]

The district court did not err in including medical expenses of $22,158.76 in computing the damage award, notwithstanding that a portion or all of such expenses were paid by or reimbursed to Mr. Titchnell as Medicare payments.

The judgment of the district court will be affirmed.

---

9. Judge Adams agrees with the majority opinion on the collateral source point because of the holding in *Smith v. United States*. In the absence of such a precedent, he would decide the issue otherwise, because he is not persuaded that there is a valid basis for permitting a plaintiff such as Mr. Titchnell to recover twice for the same damage.