Cindy **AMLOTTE,** as Next Friend to Chelsey Amlotte, a minor, Cindy Amlotte and David Amlotte, Individually, Plaintiffs,

v.

**UNITED STATES of America,**
**Defendant.**

**No. 01–10235–BC.**

United States District Court,
E.D. Michigan,
Northern Division.

Nov. 17, 2003.

Norman D. Tucker, Charles R. Ash, III, Sommers, Schwartz, Southfield, MI, Brian J. Casey, Mulcahy, Casey, Southfield, MI, for Plaintiffs.

Elizabeth J. Larin, United States Attorney's Office, Detroit, MI, for Defendant.

### OPINION AND ORDER GRANTING PLAINTIFF'S MOTION IN LIMINE

LAWSON, District Judge.

The plaintiffs have filed a complaint alleging that the minor plaintiff, Chelsey Amlotte, suffered damages as a result of medical malpractice committed by doctors at the Alcona Health Center in Lincoln, Michigan. That facility is a federally supported medical clinic, and its covered physicians are deemed employees of the Public Health Service. *See* 42 U.S.C. § 233(g). The plaintiffs' claim, therefore, has been filed under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.*, which is their exclusive remedy against the clinic and its employees. *See* 42 U.S.C. § 233(a). Under the FTCA, the United States is liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. A dispute has arisen between the parties as to an element of damages for which the United States may be liable. Specifically, the parties disagree on whether damages for the cost of Chelsey Amlotte's future medical care may be reduced by the amount that may be paid by the Medicare program now in place to cover ailments of the type suffered by the minor plaintiff. The plaintiffs seek a resolution of this question through their motion styled as a motion *in limine*, in which they ask the Court to prevent the United States from offering at trial any evidence of future Medicare payments that could be set off against damages for future medical expenses.

Based on the analysis set forth in detail below, the Court finds that Michigan has altered the traditional common-law rule that prohibited setting off against damage

awards payments from collateral sources, such as insurance. The Michigan legislation explicitly sets forth those elements of damages that are subject to reduction by payments derived from collateral sources; damages for future medical expenses is not among the listed elements of damages. The Michigan legislation, however, did not alter the common-law rule that a defendant may set off direct payments made by a defendant to an injured party. Payments coming from government programs can be characterized as gratuitous benefits—in which case they would fall into the "direct payment" category—or proceeds that are in the nature of insurance—which would thus be treated as coming from a "collateral source." The Court finds that the benefits that would be available to Chelsey Amlotte under both Part A and Part B of Medicare should be characterized as insurance benefits, and thus treated as a collateral source. Since payments from a collateral source may not be set off against future medical expenses under Michigan law, evidence of such payments would be irrelevant. The Court, therefore, will grant the plaintiffs' motion *in limine*.

## I.

Chelsey Amlotte's parents took her to the Alcona Health Center for treatment of her ulcerative colitis. Some time after September 1994, Chelsey was administered the drug Asacol, which can and apparently did cause severe kidney damage to Chelsey. As a result, Chelsey Amlotte developed chronic interstitial nephritis with end stage renal disease (ESRD). The plaintiffs attribute Chelsey's ESRD to the negligence of the medical personnel at the Alcona Health Center due to their failure to properly administer Asacol and monitor their patient to detect and promptly treat the harmful side-effects of the drug. From February to October 2000, Chelsey underwent renal dialysis, and received a kidney transplant at the end of that course. The plaintiffs allege that the medical evidence will show that Chelsey likely will require at least one more transplant at an undetermined time in the future, preceded by episodes of renal failure that will require treatment by dialysis for certain periods throughout her life.

Initially, Chelsey's medical expenses were covered by private insurance available through her parents' employment. After a 30–month period during which the private coverage was coordinated with Medicare, which apparently ended as of August 2002, the Medicare Program became Chelsey Amlotte's primary medical payor for treatment of her ESRD. At present, therefore, although the Medicare benefits paid on Chelsey's behalf have been minimal, it is expected that Medicare will cover most of Chelsey's future medical expenses, including the costs of future transplants, anti-rejection medications, and dialysis.

The dispute over whether these future Medicare benefits may be set off against the cost of future medical care arose during pretrial settlement negotiations, in which the Court did not participate. The parties seek a resolution of the issue to help guide future discussions and to prepare to meet the evidence at trial.

## II.

The provision of the FTCA stating that the government "shall be liable [for tort claims] ... in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, has been held to mean that liability of the federal government is determined by the law of the State in which the incident in question occurred. *Young v. United States*, 71 F.3d 1238, 1242 (6th Cir. 1995); *see Douglas v. United States*, 658 F.2d 445, 449 n. 5 (6th Cir.1981) ("[S]tate

collateral source rules are applied in FTCA actions."). As in cases arising under this Court's diversity jurisdiction, therefore, this Court must determine the law that the Supreme Court of Michigan would apply if it were adjudicating the same facts alleged against a private individual. *See Owen v. United States,* 935 F.2d 734, 738–39 (5th Cir.1991); *Black v. United States,* 421 F.2d 255, 258 (10th Cir.1970). If the state's highest court has not decided an issue, then "the federal court must ascertain the state law from 'all relevant data.'" *Garden City Osteopathic Hosp. v. HBE Corp.,* 55 F.3d 1126, 1130 (6th Cir.1995) (quoting *Bailey v. V & O Press Co.,* 770 F.2d 601, 604 (6th Cir. 1985)). "Relevant data" includes the state's intermediate appellate court decisions, *ibid.,* as well as the state supreme court's relevant *dicta,* "restatements of law, law review commentaries, and the 'majority rule' among other states." *Angelotta v. American Broad. Corp.,* 820 F.2d 806, 807 (6th Cir.1987).

### A.

Before the state legislature acted in 1986, Michigan applied the traditional common-law rule with respect to damages that had been paid to a tort victim from a collateral source. That is, an injured party could recover full damages from the responsible tortfeasor without any reduction based upon benefits the injured party received from a collateral source, such as medical insurance, or worker's compensation, or disability insurance. The availability of these payment sources had no impact upon the tortfeasor's obligation to compensate the injured party for these losses. *See, e.g., Blacha v. Gagnon,* 47 Mich.App. 168, 209 N.W.2d 292 (1973).

The so-called collateral source rule was abrogated to some degree by the enactment of legislation in 1986 that prescribed a methodology for accounting for payments that a tort victim received from collateral sources, and setting off some of those payments against damages awarded against the tortfeasor. "Collateral source" is defined in Mich. Comp. Laws § 600.6303, which states as follows:

(1) In a personal injury action in which the plaintiff seeks to recover for the expense of medical care, rehabilitation services, loss of earnings, loss of earning capacity, or other economic loss, evidence to establish that the expense or loss was paid or is payable, in whole or in part, by a collateral source shall be admissible to the court in which the action was brought after a verdict for the plaintiff and before a judgment is entered on the verdict....

(2) The court shall determine the amount of the plaintiff's expense or loss which has been paid or is payable by a collateral source. Except for premiums on insurance which is required by law, that amount shall then be reduced by a sum equal to the premiums, or that portion of the premiums paid for the particular benefit by the plaintiff or the plaintiff's family or incurred by the plaintiff's employer on behalf of the plaintiff in securing the benefits received or receivable from the collateral source....

(4) As used in this section, "collateral source" means benefits received or receivable from an insurance policy; benefits payable pursuant to a contract with a health care corporation, dental care corporation, or health maintenance organization; employee benefits; social security benefits; worker's compensation benefits; or medicare benefits. Collateral source does not include life insurance benefits or benefits paid by a person, partnership, association, corporation, or other legal entity entitled by law to a lien against the proceeds of a recovery by a plaintiff in a civil action for damages. Collateral source does not include benefits paid or payable by a

person, partnership, association, corporation, or other legal entity entitled by contract to a lien against the proceeds of a recovery by a plaintiff in a civil action for damages, if the contractual lien has been exercised pursuant to subsection (3).

Mich. Comp. Laws § 600.6303. Another statute requires the fact finder to make specific and separate damage allocations for medical and health care costs, loss of wages and earning capacity, other economic damages, and non-economic damages, both past and future in each category. *See* Mich. Comp. Laws § 600.6305. Yet another statute then instructs the trial court as to the manner of computing the judgment amount in light of the verdict award and the evidence of collateral source payments:

> After a verdict rendered by a trier of fact in favor of a plaintiff, an order of judgment shall be entered by the court. Subject to section 2959, the order of judgment shall be entered against each defendant, including a third-party defendant, in the following order and in the following judgment amounts:
>
> (a) All past economic damages, less collateral source payments as provided for in section 6303.
>
> (b) All past noneconomic damages.
>
> (c) All future economic damages, less medical and other health care costs, and less collateral source payments determined to be collectible under section 6303(5) reduced to gross present cash value.
>
> (d) All future medical and other health care costs reduced to gross present cash value.
>
> (e) All future noneconomic damages reduced to gross present cash value.

> (f) All taxable and allowable costs, including interest as permitted by section 6013 or 6455 on the judgment amounts.

Mich. Comp. Laws § 600.6306(1).

The plaintiffs point out that the statutory blueprint directs that economic damages must be offset by the collateral source benefits referenced by Section 6303, but it has no provision for offsetting future medical and health care costs; it merely provides that those future expenses be reduced to gross present value. *See* Mich. Comp. Laws § 600.6306(d). The plaintiff argues, therefore that in Michigan, economic, medical damages are not subject to any collateral source rule. Although not addressed by the Michigan courts in a published decision, the Michigan Court of Appeals has affirmed this reading of the statute in an unpublished decision. *See Bender v. Farmington Ridge L.P.*, No. 208545, 2000 WL 33407113 (Mich.Ct.App. Sept.8, 2000) (finding that the plain language of the statute excluded medical costs from operation of the collateral source rule).

The defendant does not dispute the plaintiffs' interpretation of Michigan's statutory collateral source rule, and the Court agrees with the plaintiffs' reading as well. *Compare* Mich. Comp. Laws § 600.6306(1)(a) (calculating "[a]ll past economic damages, less collateral source payments as provided for in section 6303.") *and* Mich. Comp. Laws § 600.6306(1)(c) (computing "[a]ll future economic damages, less medical and other health care costs, and less collateral source payments determined to be collectible under section 6303(5) reduced to gross present cash value.") *with* Mich. Comp. Laws § 600.6306(1)(b) (awarding "[a]ll past noneconomic damages.") *and* Mich. Comp. Laws § 600.6306(1)(d) (allowing "*[a]ll future medical and other health care costs reduced to gross present cash value*" with-

out any adjustment for potential collateral source payments) (emphasis added). As the language indicates, Section 6306, which governs the manner in which the Court is to enter judgment, plainly provides for collateral source payments to be deducted from certain types of damages, but not others. The Court presumes that such a pattern of inclusion and exclusion within the same statute was the intent of the Michigan legislature. *In re MCI Telecomms. Complaint,* 460 Mich. 396, 415, 596 N.W.2d 164, 176 (1999). Furthermore, in the absence of a definitive holding from the Michigan Supreme Court, this Court ordinarily will defer to the interpretation of the Michigan Court of Appeals, even though the *Bender* decision is unpublished. *See Ziegler v. IBP Hog Market,* 249 F.3d 509, 517 (6th Cir.2001).

### B.

■ But the United States contends that the Court must look further to resolve the issue. Although the statute defines "collateral source" to include Medicare benefits, *see* Mich. Comp. Laws § 600.6303(4), it does not necessarily take into consideration cases in which the United States is a defendant—as well as the payer of those benefits—nor would it since federal courts have exclusive jurisdiction over injury claims against the United States for money damages. *See* 28 U.S.C. § 1346(b)(1). The government argues, therefore, that Medicare payments are not "collateral" at all, because they come directly from putative tortfeasor.

Indeed, at common law, payment for medical costs prior to recovery of a judgment could arise from two important sources: the defendant himself, or someone else. These sources of payment are referred to as "direct" or "collateral," respectively. *See* Dan B. Dobbs, *Law of Remedies* § 8.6(2), at 488 (1993). As Dobbs explains:

The general rule is that the defendant does get such a credit when the benefits are direct benefits but that the defendant does not get such a credit when the benefits are collateral benefits.

Suppose the defendant negligently injures the plaintiff. The defendant accepts some of the blame and pays the plaintiff's medical expenses. That is a direct benefit for which the defendant is entitled to credit. When the plaintiff's employer pays the plaintiff's wages in spite of injury, however, that benefit is collateral. As to that benefit the defendant is entitled to no credit; he remains liable for the wage loss claim although in fact the plaintiff has continued to receive wages from his employer.

*Id.* § 3.8, at 372.

Section 6303 makes no reference to direct payments. The Court concludes that the adjustments fashioned by this section apply only to collateral benefits, not those paid directly by the defendant. In that context, the direction to award "[a]ll future medical and other health care costs reduced to gross present cash value" contained in Section 6306(d) is ambiguous, since future medical costs already furnished by the defendant could be considered a direct benefit that could be set off under common law.

Michigan courts have recognized, admittedly infrequently, that defendants could be credited for direct benefits conferred upon the plaintiff following the commission of the tort. *See, e.g., Troppi v. Scarf,* 31 Mich.App. 240, 254–55, 187 N.W.2d 511, 517–18 (1971), *overruled on other grounds by Taylor v. Kurapati,* 236 Mich.App. 315, 355, 600 N.W.2d 670, 691 (1999) (citing Restatement of Torts § 920, at 616, and suggesting that the value of a child must be taken into account when awarding damages in a wrongful conception case). The Second Restatement of Torts follows this

rule today, crediting the defendant for payments he makes to the injured party, but not for those made by others. *See* Restatement (Second) of Torts § 920A (1979). The Michigan Court of Appeals continued to recognize a defendant's right to reimbursement in such situations even in the wake of the 1986 revisions to the collateral source rule. *See Ray v. Dept. of Soc. Servs.*, 156 Mich.App. 55, 401 N.W.2d 307 (1986). There, the plaintiff, who was a recipient of income and medical benefits from the Michigan Department of Social Services (DDS), slipped and fell in the DSS building. After successfully establishing the Department's liability for her injury, the defendant sought reimbursement for the medical expenses it had paid through the state-administered Medicaid program. Noting that a lien on such proceeds existed by virtue of state law, the state court of appeals also concluded that "[t]here should be an offset against the judgment for such expenses and the plaintiff should recover only $200, *the amount by which she was actually damaged.*" *Id.* at 66, 401 N.W.2d at 312 (emphasis added).

■ The Court sees no indication that the Michigan legislature has abrogated the common-law distinction between direct and collateral benefits. The statutory scheme in question is designed to limit the traditional collateral source rule. Benefits conferred directly by defendant themselves upon the plaintiff simply were not addressed. It would be quite remarkable for what the Michigan Supreme Court has itself characterized as a "tort reform" statute, *Nation v. W.D.E. Elec. Co.*, 454 Mich. 489, 492, 563 N.W.2d 233, 235 (1997), to actually change the common law rule to prohibit a defendant the reimbursement to which he was already entitled. Moreover, "[w]ell-settled common-law principles are not to be abolished by implication, and when an ambiguous statute contravenes common law, it must be interpreted so that it makes the least change in the common

law." *Burden v. Elias Bros. Big Boy Restaurants*, 240 Mich.App. 723, 727, 613 N.W.2d 378, 381 (2000).

The Court concludes from "all relevant data" that Michigan has retained the distinction between direct and collateral benefits after the enactment of Mich. Comp. Laws §§ 600.6303–6306. Although there is no definitive pronouncement from the Michigan Supreme Court on this subject, the Court discerns from the tepid endorsement of the concept by the Michigan Court of Appeals for the concept, combined with the resounding weight of the torts restatement and the leading commentator on remedies, that the Michigan Supreme Court would exclude direct benefits from the operation of Section 6306(d) and require them to be set off from damages awarded for future medical costs, or at least preclude them from initially being included in the calculation of such "costs" in a damage award.

### C.

The question remains, however, whether the Medicare benefits on which the government proposes to offer evidence in this case should be characterized as "direct" or "collateral" benefits. The government observes, correctly, that there is little state law, in Michigan or elsewhere, to guide that inquiry. Accordingly, while courts have held that state law is the "starting point for an analysis for the applicability of the collateral source rule" in FTCA actions, they typically resort to federal case law to resolve the issue. *Burke v. United States*, 605 F.Supp. 981, 992 (D.Md.1985) (relying on federal law when Maryland law does not discuss the applicability of the collateral source rule where both the benefit and recovery flow from the same party); *see also Kornegay v. United States*, 929 F.Supp. 219, 220 n. 1 (E.D.Va.1996) (finding that state law "provide[s] little guid-

ance" on collateral source issues in actions involving the federal government); *Feeley v. United States,* 337 F.2d 924, 932–33 (3d Cir.1964) (finding state law to be of "little help," and looking to federal decisions to decide whether payment by the United States was a collateral source in an FTCA case).

Federal courts that have opined on the question do not include the Sixth Circuit. The cases from elsewhere, however, tend to draw distinctions by determining whether the federal program in question operates more like a form of insurance—a paradigmatic collateral source recognized as such by the Michigan collateral source legislation, *see* Mich. Comp. Laws § 600.6303—or rather a gratuitous benefit conferred by the United States at no cost to the citizen plaintiff. One test applied focuses on whether the injured party had contributed to the fund from which he or she is now receiving benefits. *Berg v. United States,* 806 F.2d 978, 985 (10th Cir.1986); *Siverson v. United States,* 710 F.2d 557, 560 (9th Cir.1983). If the injured party contributed to the program, the source is usually found to be collateral because double recovery is justified where the original source was supplied by the plaintiff. *Kirkland v. United States,* 1998 WL 895658 (N.D.Ill.1998). To a lesser extent, courts have looked to the nature of a program's funding. Programs supported by the unsegregated funds of the general treasury are not deemed collateral; those supported by a special fund, distinct from government revenues, and to which the beneficiary contributed, are collateral. *Molzof v. United States,* 6 F.3d 461, 466 (7th Cir.1993); *Mays v. United States,* 806 F.2d 976, 977 (10th Cir.1986).

The Court finds that the leading case on the subject is *Overton v. United States,* 619 F.2d 1299 (8th Cir.1980). There, the plaintiff successfully sued the federal government after complications arose from the receipt of a swine flu vaccination in Missouri. After affirming the district court's damage award, the Eighth Circuit proceeded to determine whether the amount awarded should be offset by approximately $6,000 in medical expenses that were paid on the plaintiff's behalf through Medicare. The plaintiff's benefits had been conferred through "Part A" of the Medicare program from the Federal Hospital Insurance Trust Fund. The Trust Fund, in turn, is funded by general federal revenues paid in accordance with estimated receipts of Social Security taxes to be paid into the Treasury that year. *Id.* at 1305. The Court first noted two types of "collateral sources" under Missouri law: those that contributed toward the plaintiff's care gratuitously, and those that did so in exchange for a premium, such as an insurance policy. *Id.* at 1307. The question for decision was whether benefits from Medicare Part A were more analogous to one of these two types of collateral sources or rather a direct benefit conferred by the United States government.

The Eighth Circuit concluded that for the *Overton* plaintiff, Part A operated more in the sense of a direct benefit. The Court took note of the two different approaches among the Circuits in classifying government benefits for collateral source purposes. One distinguished between benefits conferred from "unfunded general revenues" and those stemming from "a special fund supplied in part by the beneficiary or a relative upon whom the beneficiary is dependent." *Smith v. United States,* 587 F.2d 1013, 1015–16 (3d Cir. 1978) (quoting *United States v. Harue Hayashi,* 282 F.2d 599, 603 (9th Cir.1960)). The other approach makes "a distinction between those proceeds that are in the nature of insurance to the plaintiff and those proceeds that are not." *Overton,* 619 F.2d at 1308. The *Overton* Court favored the latter:

In our view the first distinction is unsound, although some courts have purported to rely on it, because it makes recovery depend on bookkeeping conventions and because it ignores the substantial governmental involvement in the creation and administration of social security programs. It is an artificial distinction that invokes no notion of "substantial justice" to support a possible double recovery by plaintiff. It is the second distinction that best explains *Smith* and *Hayashi*. Absent some statute to the contrary, plaintiffs receiving governmental benefits should receive their FTCA awards free of any set-off for those benefits if there is a showing or a presumption that they or one on whom they were dependent paid a special levy or fee to make the benefits possible. Absent a special payment by plaintiff, the government should not be forced to compensate plaintiff twice, once with money funneled through a special compensation scheme, and again with expenditures from general revenues.

*Ibid.* Because the plaintiff was over 65 years of age when the Medicare program was created, and thus had never contributed to it, *Overton* concluded that past medical expenses paid by Part A of Medicare were appropriate set off against the plaintiff's damage award. *See also Berg v. United States,* 806 F.2d 978, 985–86 (10th Cir.1986) (holding that "when a plaintiff has paid Social Security taxes while employed, any Medicare benefits that are subsequently received are a collateral source"); *Mays v. United States,* 806 F.2d 976, 977 (10th Cir.1986) (finding that the government was entitled to offset payments for armed services medical benefits where no premium was paid for them by the soldier, and the benefits were therefore received by the plaintiff "because of her husband's *status,* not because of a monetary investment").

The Third Circuit's decision in *Titchnell v. United States,* 681 F.2d 165 (3d Cir. 1982), another case arising from complications of administering a flu vaccine, follows a similar line of reasoning. There, the government took exception to the district court's award of medical expenses, 80% of which had been paid for by the government under Medicare Part A and Part B. Although the government conceded that Part A was funded by compulsory taxes, it argued that Part B coverage was not a collateral source because the government financed Part B along with consumer premiums. The Third Circuit found no merit to this argument. The patient had maintained maximum Part B coverage through premiums deducted from his Social Security check each month. Furthermore, the plaintiffs had insisted without contradiction that the patient had paid Social Security taxes while employed, and revenues from those taxes "determine the level of appropriations from the treasury to the trust fund for Medicare Part A." *Id.* at 176. In light of these findings, the district court did not err in concluding that both Parts of Medicare were collateral sources as to the plaintiffs.

There has been a notable reluctance on the part of some courts to offsetting future medical costs. In *Molzof v. United States,* 6 F.3d 461 (7th Cir.1993), for example, the Court held that Wisconsin's collateral source rule permitted the plaintiff to recover future medical expenses, even if they would be provided at no or nominal charge by the Veterans Hospital at which the medical malpractice had occurred. Citing *Feeley v. United States,* 337 F.2d 924, 934–35 (3d Cir.1964), the Seventh Circuit agreed that there was something particularly unseemly about compelling an injured plaintiff to receive future medical care from the institution or institutions that so grievously injured him in the first place. *Molzof,* 6 F.3d at 467–68. The Seventh

Circuit alternatively concluded that the availability of future benefits, which depended on whether the government would continue to allocate funds for Veteran's benefits, was too speculative in any event. *Id.* at 468 (citing *Powers v. United States,* 589 F.Supp. 1084, 1107–08 (D.Conn.1984)). *Powers,* in turn, noted that if Congress were concerned about the courts' struggles with collateral source rules, it could simply pass its own provision prohibiting (or explicitly allowing) such double recoveries. *Powers,* 589 F.Supp. at 1108–09.

■ This Court adopts the rationale set forth by the court in *Overton* and *Titchnell.* The determination of whether a payment under a government program should be characterized as "direct" or "collateral" turns on the "showing or a presumption that the[ tort claimants] or one on whom they were dependent paid a special levy or fee to make the benefits possible." *Overton,* 619 F.2d at 1308. The "premium paid" rule also would appear to be supported by Michigan law, grounded as it is in an analogy to the payment of premiums for insurance. *See* Mich. Comp. Laws § 600.6303(4) (defining "collateral source" to include, first and presumably foremost, "benefits received or receivable from an insurance policy").

■ The defendant here claims that Chelsey Amlotte will receive benefits under Part A of Medicare, which covers hospital costs, such as transplant costs, solely as a result of her status as a person suffering from ESRD. The government acknowledges that Part B benefits, which include out-patient services, such as dialysis, physician's fees, and medications, is optional and requires payment of a premium fee, currently $58.70 per month.

The Court has little trouble concluding that benefits that will be paid under Part B are analogous to insurance policy proceeds, and that damage amounts for future medical expenses that are covered under Medicare Part B for outpatient treatment and doctor's visits are not subject to setoff. The parties agree that Part B coverage is conferred only upon payment of a monthly premium. Chelsey Amlotte becomes entitled to Part B coverage only to the extent that her parents pay this premium. Under Section 6306, then, these future medical expenses may not be offset from the plaintiff's future medical expenses. *See* Mich. Comp. Laws § 600.6306(1)(d) (awarding future medical costs discounted to present value, but not directing a deduction for collateral source payments); *Bender,* 2000 WL 33407113, at *2–3.

Part A is somewhat more complicated. Normally, since Part A is funded at least indirectly by Social Security payroll assessments, the plaintiff's receipt of hospital care under Part A is easily identified as a form of insurance. *See Titchnell,* 681 F.2d at 176; *Berg,* 806 F.2d at 985–86. Here, however, the government alleges that notwithstanding any contributions by Chelsey Amlotte's parents to Medicare through compulsory payroll deductions, ESRD benefits would be available to Chelsey simply because of her "status" as a sufferer of ESRD, and would be conferred regardless of whether contributions were made or not. The Court reads the regulation that defines eligibility otherwise, however. It provides:

An individual is entitled to hospital insurance benefits if—

(1) He or she is medically determined to have ESRD;

(2) He or she is:

(i) *Fully or currently insured under the social security program* (title II of the Act) or would be fully or currently insured if his or her employment (after 1936) as defined under the Railroad Retirement Act were considered "employment" under the Social Security Act;

(ii) Entitled to monthly social security or railroad retirement benefits; or

(iii) The spouse or *dependent child of a person who meets the requirements of paragraph (c)(2)(i)* or (c)(2)(ii) of this section;

(3) He or she has filed an application for Medicare Part A; *and*

(4) He or she has satisfied the waiting period explained in paragraph (e) of this section.

42 C.F.R. § 406.13(c) (emphasis added).

The language quoted above does not allow a person suffering from ESRD to receive benefits solely because of their status as a sufferer of that disease. Rather, other important conditions must be met, including acquiring "insured status" under Title II of the Social Security Act. "Insured status" under Title II requires that a person actually work and pay into the system through payroll deductions for at least 20 quarters out of a 40-quarter period. *See* 42 U.S.C. § 423(c)(1). Persons whose work history does not continue within that framework lose insured status. *See Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir.1988). Here, contributions by the ESRD sufferer or a person upon whom he or she is dependent is a prerequisite to the receipt benefits under Medicare Part A.

If Chelsey Amlotte were to regress into ESRD with her replacement kidney in the future, the parties do not dispute that she would qualify for Medicare Part A hospitalization benefits if private insurance was otherwise unavailable to cover her treatment. Regardless of whether Chelsey is "[f]ully or currently insured under the social security program," 42 C.F.R. 406.13(c)(2)(i), the government does not deny the plaintiffs' contention that Chelsey's parents, by virtue of their payroll contributions to the social security program, are so insured, and that Chelsey is their "dependent child" under subsection (c)(2)(iii) of the regulation. Under the logic of *Overton,* one who contributes to Medicare Part A is entitled to its benefits, as any beneficiary under an insurance policy.

The Court finds, therefore, that future payments under Medicare Part A and Part B operate more like an insurance policy obtained through the contribution of the tortfeasor or a person on whom the tortfeasor is dependent, rather than like a gratuitous payment. Those payments should, therefore, be characterized as coming from a collateral, rather than a direct, source.

### III.

The Court finds that the Medicare payments for future medical expenses should be treated as a collateral source. Since payments from a collateral source may not be set off against future medical expenses under Michigan law, evidence of such payments is irrelevant. Only relevant evidence is admissible at trials before the courts of the United States. *See* Fed.R.Evid. 402.

Accordingly, it is **ORDERED** that the plaintiffs' motion *in limine.* [dkt # 54] is **GRANTED.**